Christian, J.
This is a writ of error to a judgment of the Circuit court of Eockbridge.
The prisoner in his petition, and his counsel at the bar here, assign but one ground of error, and that is, that the Circuit court erred in overruling the objection of the prisoner to the introduction of the dying declarations of the deceased.
The alleged ground of the objection is, that no sufficient foundation for their introduction had been laid.
The rule of law on this subject is well settled, that to render dying declarations admissible evidence, they must be shown to have been made when the declarant is under a sense of impending death, and without any expectation or hope of recovery. "When this is made to appear by proof, or by the circumstances of the case, dying declarations to identify the prisoner, or to establish the circumstances of the res gestee, orto show transactions from which death results, are always ad *965 missible, to have the same weight as if made under the sanctions of an oath. For it is considered that when an individual is in expectation of impleading death, all temptation to falsehood, either of interest, hope or fear, will be removed, and the awful nature of his situation will be presumed to impress him as strongly with the necessity of a strict adherence to truth as the most solemn obligation of an oath administered in a court of justice. As was said in Dunn v. The State, 2 Pike’s R. 229, cited in 1 Wharton 671:
“When every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful consideration to speak the truth—a situation so solemn and awful, is considered by the law as creating the most impressive of sanctions.” Whether the dying declarations sought to be introduced were made under a sense of impending death, without any expectation or hope of recovery, is always a question to be determined by the court on all the circumstances of the case. 1 East P. C. 857; 1 Stark. Ev. 523; Bull’s case, 14 Gratt. 613.
Let us now apply these well established rules of law to the case at bar. In a fight between the prisoner and the deceased, which occurred about seven o’clock P. M. on the 8th of January 1875, the deceased was stabbed in two places in the body, of which wounds he died on the night of the 18th January 1875.
The declarations of the deceased, offered as evidence, were made on the night of the 8th, about two hours after he received his wounds: and the question was, whether at that time he had a consciousness of impending death, and then had no hope of recovery. It becomes necessary therefore to examine the testimony of the witnesses who saw him on the night of the 8th, before and at the time the declarations offered *966 in evidence were made. George Smith, who seemed to have been present just as the fight closed, proved taht deceased seemed badly hurt; said he was cut to pieces; called out to his brother to kill the prisoner -if he could; that he then walked from the place where he was wounded to the shop of the witness, which was 112 feet, and thence 55 feet further, into the house of witness, who sent for two physicians. Deceased said he could not live until the doctors came unless there was haste made. Said again he could not live, believed he would die befoi’e the doctor came; lost a good deal of blood; his pulse was weak.
Another witness, father of the deceased, proved he saw deceased about 25 minutes after he was wounded; was then at Smith’s house. Deceased said he was badly cut. Witness told him he was excited. He replied he was not excited, and that if any of the family wished to see Mm they must be got there as soon as possible. He said he would not get over it. This was before the doctors came: frequently said during the same night he could not get over it.
Another witness proved that she saw deceased at Smith’s house about 15 minutes after he was wounded. He looked as if he would die; she feared he would from his appearance. He repeated several times he would die: said, “I think I am going to die;” and afterwards, “I will die: I will never recover.” All this was about an hour before Dr. Alexander came. When his father spoke of sending for Dr. Morrison, deceased said he would die. When he said he was going to die, witness told Mm not to think so; that if it was ordered he should die, the doctors would so tell him; that he must not be unnecessai’ily frightened. He made no reply then; but afterwards witness heard him say he would die. Witness thought that deceased *967 thought he would die; and it was not a mere exclamation of pain, but the expression of an opinion.
- Dr. Alexander proved that he reached the deceased about 10 o’clock on the night of the 8th January 1875; dressed his wounds; found him excited; that he was wounded in two places, one between the 6th and 7th rib on the left side, and the other in the abdomen; found him pale, but not from loss of blood: said nothing to deceased of his condition, and heard him say nothing; gave him morphine, and he went to sleep sitting in a chair. While attending on deceased, witness was sent for to see prisoner, who was cut in his hand, and on returning to deceased found Dr. Morrison with him.
Dr. Morrison proved, that he reached deceased about 11 o’clock of the night of the 8th January. He had lost some blood; was under prostration due to shock from his wounds. * * * * When witness first saw deceased he was pale, had clammy sweat and was much prostrated; but reaction had already begun to set in. He thought when witness first saw him, he was going to die. Witness told him he might get well or might dfe. Witness (who was a surgeon in the Confederate army), told deceased he had seen many men no-worse hurt than he was get well. Deceased was obviously encouraged by this, as witness thought. Afterwards, later in the night, about 1 o’clock, witness was called from another room whither he had gone, to see deceased, where some attendants had undertaken to lay him down on a pallet. The effect was to pass the discharge from his wound into his lungs, suffocating him, and making respiration very distressing. Witness replaced him in his chair, where he was more comfortable ; found him no worse, and he revived again, talked, and witness thought he was better. He said *968 however, he would die, and his wounds reasonably justified that opinion. Witness then left him for the night, being satisfied he was not then in immediate danger. rjn]-ie next morning he was much revived: no doubt he felt better, and obviously was satisfied he was better. For five or six days witness had good hope deceased would recover; would say to him when he visited him—“ Jim, I hope you will get well;” and he would answer—“I hope so too.” He said the morning after he was wounded, he felt better, and repeated the same thing on my several visits. Witness did not remember that deceased ever said in so many words, he thought he would recover; but he was certainly hopeful in opinion of witness. Witness was much encouraged about him, when about four days after he was wounded his bowels were favorably operated on. When on witness’s first visit, deceased said “he thought he was going to die,” witness encouraged him, felt his pulse, told him he was not dying, and he certainly was not then in a dying condition, and that as badly hurt men as he, witness had seen get well. On the night of the affray deceased frequently said he would die, and that this was not an exclamation of pain, but the expression of an opinion.

Witness thought that during the whole of the first night, up to the time he last saw him that night, that deceased was of opinion then that death was impending, and that declarations made by deceased that night, were made in view of an impending death.

Witness never heard him say he would get well, but would say he was better and felt better, and no doubt had hope. He never said in presence of witness, after first night, he thought he was going to die. Witness had hope up to within two days of deceased’s death; up to that time witness thought deceased was hopeful. *969 "Witness told some of the family of deceased, that witness thought he was going to die. Perhaps his mother told him after that, she thought he would die, ■and to make preparations. Witness thought he had no hope after that.
Another witness, the brother of the deceased, proved, that he went for Dr. Morrison, and went in with Dr. M. to see deceased. That then deceased said he would not get well; never heard him say otherwise. The evening before his death deceased reached out his hand and said to witness “ my time is short, call all in to see me.” A minister of the gospel then prayed in the house.
This was all the material evidence certified by the Circuit court, as the foundation upon which the dying declarations were admitted.
It is urged on behalf of the prisoner, that a proper foundation was not laid for the introduction of the dying declarations, because the evidence failed to show that the deceased was under a sense of impending death without hope of recovery; but that on the contrary, it was shown that he had hope of recovery; and that therefore the evidence of his dying declarations were not admissible. To sustain this view, the evidence of Dr. Morrison is relied on; for the four other witnesses examined on this point, all agree that they heard the •deceased give no indication that he had any hope of recovery. But the testimony of Dr. Morrison, which has reference to the night on which the declarations of the deceased were made, is not, when properly understood, at all in conflict with that of the other witnesses. The testimony of Dr. M., as to the expressions which fell from the prisoner, that “he felt better,” that “he hoped he would get well,” and that in the •opinion of the doctor he was hopeful and encouraged, *970 manifestly refer to occasions when he saw him after the night of the 8th January; for the doctor emphatically says, that on that night “he said that he would ¿pe an(j tpat Pia wounds reasonably justified that-opinion.”
Again he says, after referring to the fact that he-sometimes seemed encouraged and said he felt better, and in reply to the remark of the doctor, “Jim, I hope you are better,” said “I hope so too,” adds, “On the night of the affray deceased frequently said he would die; and this was not merely an exclamation of' pain, but the expression of an opinion. "Witness thought that during the whole of the first night, up to the time he last saw him that night, deceased was of' opinion that death was impending; and that declarations made by deceased on that night were made in view of impending death.”
ISTow it is evident, that the casual expressions of' hopefulness made by the deceased, were not made on the night of the 8th of January, but at various times afterwards, when encouraged by his physician that he-was better, and when he may have in fact felt better. It is thus clear, that on the night of the 8th of January when the declarations offered were made, the deceased was fully impressed with the conviction that he must di'e of his wounds, and had not the remotest hope of' recovery. The fact that he did not die immediately, or-during that night, but lingered for ten days, and during that time gave expression to gleams of hope when-encouraged by his physician, does not alter the case.. The question is, always, did the deceased, at the time-the declarations were made, have the consciousness, that death was impending, and had no expectation or-hope of recovery? If the declarations were made under the sense of impending dissolution, and a con *971 seiousness of the awful occasion, the principle is not affected hy the fact that death did not ensue until a considerable time after the declarations were made 1 Whar. 671; 2 Russ. Crim. 757;—nor by the fact that on other days, when encouraged by others, he may have expressed some slight hope of recovery, unless such expressions, taken together with all the circumstances of the case, shew that he had hope of recovery when the declarations offered were made.
The fact of the declarations not being made im mediately previous to death, will not exclude them, provided the deceased was conscious at the time he made them, that he was in a dying condition. 1 Greenl. Ev. 158; McDaniel v. State, 1 Smeedes & Mar. 401; State v. Poll, 1 Hawks R. 442; Commonwealth v. Cooper, 5 Allen’s R. 495; Rex v. Mosley & Morrill, Moody’s C. C. R. 97; referred to in 3 Rob. Pract. old ed. 208.
The last named case is strikingly analogous to the one under consideration. In that case the injury that caused the death of the deceased, was inflicted on the evening of the 30th September; in consequence of which he was brought home and put to bed, and a surgeon was sent for on that evening to attend him. The declarations in question were made the same evening. The surgeon continued to attend him until his death; which took place on the 10th October. In his evidence the surgeon stated that previously to the 10th of October, he did not regard the case of the deceased hopeless, nor did he so represent to him; that he told him there was danger, but held out to him hopes of' recovery; though he did not know whether deceased entertained hopes or not, as he never expressed to the surgeon any opinion either of hope or apprehension; but that when he saw deceased on the 10th of October *972 he felt certain he would die that forenoon, and communicated to him the hopelessness of his state.
In consequence of this evidence of the surgeon it became material to enquire further, as to the prior hopeless state of the deceased, and his consciousness of it, from the commencement of, or during his illness, in order to ascertain, whether the declarations aforesaid were admissible in evidence or not. To this point a witness stated, “that she was sent for to the deceased, on the evening of the 30th September; that he was in a very ill state indeed; that he said he was robbed and killed; that he should never get better of it; that she assisted in putting him to bed, and continued to attend him till his death; that during that time he spoke of dying, and said he could not continue long—a few days would finish him; that he all along said he never would get better; that he never missed saying so one day before the latter end.” Witness also stated, that she was a nurse accustomed to attend such people, and very often found them low spirited, and have known many persons say they should never get better, who have got. better; that deceased talked in that way; that about Tuesday before his death, he said' he should not continue many days; that it was before that he told her all about it; that the first night he said he should not get better and continued to say so till the last day.
On this evidence it was objected for the prisoners, that a sufficient foundation was not laid for receiving evidence of the declarations of deceased made on Thursday evening the 30th of September. But Holroyd J. who tried the case, admitted the declarations; and upon that and other proof the prisoners were convicted of murder. Upon a case reserved, the court consisting of ten judges, was unanimously of opinion, *973 that the declarations were properly received. These two cases are singularly alike. In both cases the deceased lingered ten days after the fatal wounds were received. In both cases the surgeon attending did not think the wounds necessarily mortal; and encouraged the deceased that the case was not hopeless. In both cases the declarations offered were made on the night when the injury producing death was inflicted. In both cases it is shown that the deceased on that night said he would never get over it,—that he must die, and similar expressions,—which were also used at various times during the lingering suffering of both for ten days.
In the ease before us three witnesses, being those most constantly in attendance, prove that from the first night to the last (as was proved by one witness in the case cited), the deceased always said he must die.
The only difference is, that in the case before us, on one occasion several days after the declarations were made, in reply to the remark of the physician, “Jim, I hope you will get well,” deceased replied, “I hope so too.” This remark was the only one made, during the whole ten days, indicating that at any time there was on the mind of the deceased the slightest hope of his recovery; but this remark when taken in connection with the other evidence in the case and the circumstances under which it was made, does not show, or tend to show, that on the night of the 8th of January, when the declarations were made, the deceased had the slightest hope of recovery; especially when the intelligent physician who testified to this remark, says emphatically, that during the whole night of the 8th of, January, up to the time he saw him last that night, deceased was of opinion that
*974 death was impending, and that declarations made by deceasd on that night were made in view of impending death."
Certainly we cannot say, upon such evidence as this, that the opinion of the Circuit court in declaring, that a proper foundation had been laid for the introduction of dying declarations, was erroneous. Much weight ought always to be given to the opinion of the court below in determining this question. The duty by law is devolved on him to determine, not only from the proofs, but from all the circumstances of the case, whether the declarations are admissible. Bull’s case, 14 Gratt. 613; Vass’s case, 3 Leigh 786. That court has all the witnesses in its presence, hears them speak, can judge of their credibility, is cognizant of all the circumstances of the case, and to its judgment the law refers the determination of the question whether the declarations were admissible.
If that judgment is clearly erroneous, it may be reviewed like any other judgment. But in such a case, the same weight ought to be given to the judgment of the court below, as the appellate court gives to a judgment of the court of trial, when the motion for a new trial is overruled and the evidence certified. The judgment must be clearly erroneous before it will be interfered with by the appellate court.
In this case we have the evidence of four witnesses, among them the physician in attendance, all concurring, that on the night of the 8th January 1875, when the declarations were made, the deceased had no hope •of recovery; and the physician in so many words declaring that the declarations made that night, “were made by the deceased under a sense of impending death.” All this evidence comes before U3 with the ■sanction of the judge who heard the witnesses speak, *975 who knew their character and credibility, and was cognizant of all the circumstances of the case.
Can we say that because, days afterwards, not on the night when the declarations were made, the deceased expressed some vague hope that he was better, that, for that reason, all the witnesses and the judge who heard them were mistaken in their conclusión, that the deceased was without hope of recovery when the declarations were made ?
This would, it seems to me, be going farther than this court or any other, has ever gone, in declaring such a judgment erroneous. Upon the whole case, I am of opinion, that there is no error in said judgment; that it is fully sustained by the evidence, and the legal principles which govern the case; and the same should be affirmed.
Moncure P. and Staples J. concurred in the opinion of Christian J.
Anderson J. dissented.
Judgment affirmed.