RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

RICARDO WOODS,

*Petitioner-Appellant,*

*v.*

No. 19-3254

BRIAN COOK, Warden,

*Respondent-Appellee.*

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:16-cv-00643—Michael R. Barrett, District Judge.

Argued: May 7, 2020

Decided and Filed: May 22, 2020

Before: BATCHELDER, GIBBONS, and SUTTON, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Jennifer M. Kinsley, KINSLEY LAW OFFICE, Cincinnati, Ohio, for Appellant. Hilda Rosenberg, OFFICE OF THE OHIO ATTORNEY GENERAL, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Jennifer M. Kinsley, KINSLEY LAW OFFICE, Cincinnati, Ohio, for Appellant. Stephanie L. Watson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────

## OPINION

─────────────

SUTTON, Circuit Judge. When Ricardo Woods shot David Chandler in the head, he might have thought that he had silenced him for good. But while paralyzed from the neck down, Chandler retained some movement in his eyelids. In the days before he succumbed to his

injuries, Chandler used a system of blinks to identify his assailant. At Woods' murder trial, the court allowed the State to introduce Chandler's identification of Woods, holding it an admissible dying declaration. An Ohio jury convicted him, and the state courts affirmed the decision. Woods filed a habeas petition alleging a violation of his Confrontation Clause rights under the Sixth (and Fourteenth) Amendment. He also claimed the court misapplied *Batson* by not timely requiring the State to offer a race-neutral explanation for a peremptory strike. Because neither of these claims satisfies the strictures of review under AEDPA, we affirm their rejection.

I.

David Chandler struggled with drug addiction. On October 27, 2010, he indulged his habit with two companions: James Spears and William Smith. In time the three men ran out of drugs. Shortly after 1:00 a.m., Spears drove the others to downtown Cincinnati to buy more.

They parked on the side of the street and waited to connect with one of their dealers. Chandler left the car and returned two minutes later, telling the group that "his man was coming down the street." R. 10-27 at 188. Things fell apart from there. The men heard a voice from outside the vehicle on the passenger's side: "Hey, Chandler, where's my money[?]" R. 10-29 at 56. Smith glimpsed the speaker: a bearded African American man in his thirties, of average build, dressed in black. But before he could investigate, bullets ripped through the side window. Spears sped away.

Too late. One of the assailant's bullets hit Chandler's spinal cord, paralyzing him on the spot. Spears rushed Chandler to the hospital. He went to the intensive care unit, and doctors placed him on life support. Chandler lay unconscious, a ventilator doing the breathing he could not. All involved recognized the gravity of Chandler's condition.

A few days later, Chandler regained consciousness. Still in critical condition, he could control movement only in his eyes. With some experimentation, doctors worked out a system of communicating by blinking. Three quick blinks would stand for "yes," for example, and two quick blinks for "no." In this way, Chandler answered questions from his medical team and his brother.

Chandler communicated with Father Phillip Seher, a Catholic priest and friend for sixteen years. They discussed that Chandler's condition "looked very critical," he could have strokes at any point, and "many other things [could] go[] wrong." R. 10-5 at 36. Chandler communicated to Father Seher that, despite regaining consciousness, he understood his "likelihood of death was still that"—likely. *Id*. at 36–37. He asked Father Seher to administer the Sacrament of Last Rites even after being offered the Sacrament of the Sick. Father Seher did so.

On November 2, the day after he received his Last Rites, Chandler responded to questioning by the police that he knew his shooter's identity. When asked to spell out a name, Chandler blinked the letter "O." Police showed him a photo of Ricardo Woods, a dealer known on the streets as "O." Chandler confirmed that Woods shot him.

The identification didn't come as a surprise. Woods had sold Chandler drugs on many occasions, and Chandler owed him money. The day before the attack, Woods warned Chandler that "he needed to get his money [soon] or something was going to happen." R. 10-29 at 96. And the shooting happened 100 feet from Woods' house.

Chandler's health deteriorated after the police interview. Two days later, on November 4, he suffered one of many strokes. Then came an aneurysm that left him brain dead. On November 12, fifteen days after the shooting and ten days after identifying Woods, he died.

In January, the police arrested Woods in Lorain, Ohio, over 200 miles away from his house in Cincinnati. While in jail, Woods confided to his cellmate (a government informant) that he shot someone over an outstanding drug debt.

At trial, the court admitted Chandler's identification of Woods as a dying declaration. The jury convicted Woods on various offenses related to the shooting. Among other sentences, the court imposed two consecutive sentences of fifteen years to life for the murder.

Woods raised various objections on direct appeal. None gained ground. He filed a habeas petition under § 2254, pressing eleven claims. All that matters here are two sets of rulings. In one, the court denied Woods' claim that the admission of Chandler's deathbed identification violated the Confrontation Clause and granted a certificate of appealability on the

issue. In the other, the court initially granted Woods' claim that the State impermissibly struck a black juror based on race. In response to that ruling, however, the State filed a Rule 60(b) motion pointing out that the *Batson* claim turned on a transcript error that the Ohio courts corrected during the direct appeal. After reviewing the right transcript, the court granted the motion and denied the *Batson* claim. It granted a certificate of appealability on the issue.

## II.

*Confrontation Clause*. The Confrontation Clause guarantees each criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. That means the State may introduce testimony only by calling witnesses to the stand to face cross-examination by the defendant. But that rule comes with two sets of exceptions. The first is that courts may admit a witness's testimonial out-of-court statement if the prosecution establishes the witness's unavailability and shows the defendant received a "prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). The second is that the state may admit an unconfronted out-of-court statement if it fits a historically recognized common law exception. Because the Confrontation Clause is "most naturally read as a reference to the right of confrontation at common law," it incorporates "exceptions" to the confrontation requirement "established at the time of the founding." *Id.*

Courts have recognized two key common law exceptions. The first, forfeiture by wrongdoing, permits the introduction of statements by a witness unable to testify at trial and who was "detained or kept away by the means of procurement of the defendant." *Giles v. California*, 554 U.S. 353, 359 (2008) (quotation omitted). This exception prevents defendants from reaping the benefit of witness tampering or intimidation or murder. The Supreme Court has expressly approved this exception and its historical pedigree. *Id.* at 359–61.

The second exception, dying declarations, allows the government to introduce testimonial statements made by a witness who is "on the brink of death and aware that he was dying." *Id.* at 358. It is premised on the understanding that the dying usually do not spend their last breaths lying. While "[t]he existence of [the dying declarations] exception as a general rule of criminal hearsay law cannot be disputed," the Court in *Crawford* declined to decide "whether the Sixth

Amendment incorporates" the exception.  541 U.S. at 56 n.6.  *Giles* left the issue for another day too.  554 U.S. at 358–59.  The exception thus remains in High Court limbo.

Under AEDPA, Woods is eligible for relief only if he shows that the state court's decision (1) was "contrary to . . . clearly established" federal law as determined by U.S. Supreme Court precedents or (2) amounted to "an unreasonable application" of the same.  28 U.S.C. § 2254(d)(1).  That leaves two layered questions.  Did the state court's reliance on the dying declarations exception to the Confrontation Clause conflict with clearly established Supreme Court precedent?  If not, did the state court unreasonably apply the exception?

A.

The answer to the first question takes little time.  Since *Crawford*, the U.S. Supreme Court has acknowledged the potential permissibility of this common law exception to the Confrontation Clause.  *See Giles*, 554 U.S. at 358.  Under these circumstances, we cannot fault state courts for continuing to do what the U.S. Supreme Court has acknowledged they may be able to do after *Crawford* and what the Court itself did before *Crawford*.  *See, e.g.*, *Mattox v. United States*, 156 U.S. 237, 243–44 (1895) (noting that courts have treated dying declarations as "competent testimony" since "time immemorial").  We have said as much in an unpublished decision, *Walker v. Harry*, 462 F. App'x 543, 545–46 (6th Cir. 2012), and now say the same in a published decision.  Our sister circuits have taken a similar view in unpublished opinions too.  *See, e.g.*, *Martin v. Fanies*, 365 F. App'x 736, 738–39 (8th Cir. 2010); *Brown v. Att'y Gen. of Cal.*, 650 F. App'x 434, 436 (9th Cir. 2016).  We are not aware of a contrary decision, and Woods has not identified one.

B.

The focus of the appeal turns on the answer to the second question—the unreasonable application question.  For a testimonial statement to be admissible at common law, the declarant had to be "on the brink of death and aware that he was dying."  *Giles*, 554 U.S. at 358.  Chandler's statement met this requirement for several reasons.  He returned to consciousness fully paralyzed and intubated in an ICU bed.  Unable to breathe without a ventilator, he understood his peril.  While discussing his "very critical" condition with Father Seher, Chandler

"kept acknowledging" that he likely would not survive his injuries. R. 10-5 at 36–37. He requested his Last Rites. And he gave his statement to police only after receiving the sacrament. All of this satisfied the common law requirement, or at least reasonably applied that requirement, that Chandler's identification come under circumstances "so solemn, and so awful," that "every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth." *R. v. Woodcock* (1789), 168 Eng. Rep. 352, 353; 1 Leach. 500, 502.

Woods resists this conclusion on several grounds. He argues that Chandler wasn't on the "brink of death" during his interview because his "vital signs were stable" and he could "follow commands." Appellant Br. 23. But he offers nothing to suggest that the dying-declarations exception ever required dropping blood pressure or a flatlining heartbeat. It demands only injuries of "such a nature that the usual or probable effect upon the average person so injured would be mortal." *State v. Teeter*, 200 P.2d 657, 679 (Nev. 1948). We have found it enough that an individual's injuries confine him to an "intensive care unit" on a ventilator. *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976). Those who have suffered "a gunshot wound to the head" and who cannot breathe as a result have given admissible dying declarations even when they remained fully responsive and unlikely to "die under [ ] short-term care." *Barnett v. State*, 671 S.E.2d 823, 825–26 (Ga. 2009). The early cases take at least as permissive a view. They extended to badly bruised individuals whose condition doctors "did not consider . . . quite hopeless." *R. v. Mosley & Morrill* (1825), 168 Eng. Rep. 1200, 1201–03; 1 Mood. 97, 100–105.

In a similar vein, Woods objects that Chandler did not die until fifteen days after the shooting (and ten days after his interview) and that during Chandler's interview no one thought he "would die [later] that day." Appellant Br. 23. But it is not the "rapid succession of death," as opposed to its imminent likelihood, that "renders the [declarant's] testimony admissible." *Mattox v. United States*, 146 U.S. 140, 151 (1892). The early cases admitted statements made some time before death. *See, e.g.*, *Mosley & Morrill*, 168 Eng. Rep. at 1201–03 (ten days); *Woodcock*, 168 Eng. Rep. at 352 (two days); *Bambridge's Case* (1730), 17 How. St. Tr. 397, 417–18, 423 (three days). And later cases have never called that principle into doubt. *See, e.g.*, *People v. Monterroso*, 101 P.3d 956, 971 (Cal. 2004) (eleven days); *Swisher v. Commonwealth*,

26 Gratt. 963, 970 (Va. 1875) (ten days); *Kilpatrick v. Commonwealth*, 31 Pa. 198, 209, 215 (Pa. 1858) (nine days).

Woods adds that Chandler lacked the subjective "belie[f] he could [not] recover," *Giles*, 554 U.S. at 364, based on two pieces of evidence: Chandler indicated he would "walk out of the hospital" when asked what would happen if the doctor removed life support, R. 10-28 at 191–93, and he requested that doctors fight until the end. But this evidence shows Chandler's courage in the face of death; it does not change his calculation of the odds of survival. His condition, and his doctors' commentary on it, gave plenty of reason to think he wouldn't make it. And the state court did not act unreasonably in crediting the most probative—and most contemporaneous—evidence of Chandler's personal convictions: his conversation with Father Seher and his request for the Sacrament of Last Rites.

Woods separately challenges the force of Chandler's blinking testimony, noting that injuries and medication may have impaired Chandler, that muscle spasms may have generated his blinking, or that Chandler may not have seen his attacker in the night. But the State offered sufficient evidence to support the state court's ruling. It presented testimony from Chandler's doctors that he remained alert and lucid, with Father Seher adding that Chandler had the "clearest mind that [he] remember[ed] [him ever] having" during his questioning. R. 10-28 at 57. It called experts to explain the steps taken to ensure that Chandler's blinks were "purposeful." R. 10-30 at 35. And it established that Chandler had known Woods for a long time, making it unlikely that he would mistake Woods' voice or face for that of someone else. All in all, the state court's decision did not unreasonably apply the common law dying declarations rule.

### III.

*Batson claim.* Woods separately claims that the State impermissibly struck a black juror based on race. This claim, too, receives deferential review under AEDPA. *See* 28 U.S.C. § 2254(d)(1). When a defendant objects to a prosecutor's use of a peremptory strike, *Batson* requires courts to follow three steps. *Batson v. Kentucky*, 476 U.S. 79 (1986). Step One: The defendant must make out a prima facie case "giv[ing] rise to an inference of discriminatory purposes" in the peremptory strike. *Id.* at 94. Step Two: The burden shifts to the State to

"explain adequately the racial exclusion" by offering permissible, race-neutral reasons for the strike. *Id.* Step Three: The court must examine the justification and determine whether discrimination occurred. *Id.* at 97–98.

Woods claims that, after he challenged one of the State's strikes and made his prima facie case, the court failed to solicit a race-neutral explanation from the State. But here's what happened. During voir dire, the State moved to strike Juror #7, a black juror. Woods' attorney responded with a *Batson* challenge, observing that while the State hadn't "demonstrated a pattern" of striking black jurors, its choice to strike Juror #7 seemed "particularly significant because it's a white victim and African-American defendant, and there's only three African-Americans in the ven[ire]." R. 10-26 at 107. The court initially made the statement that it thought Woods may "have to [demonstrate] a pattern [of bias] first." *Id.* But it then said it would "reserve [a] statement [from the State] for later." *Id.* at 107–08. It thus seemed to acknowledge Woods' prima facie case and the State's obligation to furnish a race-neutral explanation.

Later in voir dire, the State used a peremptory strike against a second black juror. Woods' counsel again raised a *Batson* challenge. The court resolved that exchange. Then it returned to the first black juror. The court asked the State for a race-neutral explanation for striking Juror #7. The State answered that Juror #7 had previous "experience with misidentifications," which could prejudice the State's reliance on the deathbed identification of Woods. *Id.* at 220. The court gave Woods a chance to reply. He argued that Juror #7 seemed, by all accounts, "fair and impartial." *Id.* at 221. Assessing this exchange, the court found that "the State has given a race-neutral explanation, so I'm not gonna allow your *Batson* [c]hallenge." R. 28-1 at 3.

The court followed *Batson* when all was said and done—and certainly did not cross any clearly established lines. Its conduct was unusual, it is true. It introduced a delay between the time when Woods made out his prima facie case (Step One) and the time when it required the government to furnish its race-neutral explanation (Step Two). But that delay does not violate clearly established Supreme Court precedent. *Batson* itself expressly declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's

challenges." *Batson*, 476 U.S. at 99 & n.24. No Supreme Court decision has identified a *Batson* violation in similar circumstances. Nor do we see any prejudice from the variation. Woods had the chance to press his case either way.

Woods resists this conclusion on the ground that, in the transcript originally filed before this court, the state trial court said that "the State hasn't given a race-neutral explanation, so I'm gonna allow your *Batson* challenge." R. 10-26 at 222. But that transcript reflects two since-corrected errors by the court reporter. In fact, the court said, "the State has given a race-neutral explanation, so I'm not gonna allow your *Batson* [c]hallenge." R. 28-1 at 3. It bears noting that the state courts caught the error, and each court assessed the claim under the right transcript.

Woods also complains that the trial court said he may "have to [demonstrate] a pattern [of bias] first" before pressing his *Batson* objection. R. 10-26 at 107. If the court meant that Woods had to wait until the State struck multiple black jurors, it misunderstood the law. A pattern of strikes is not the only relevant evidence. A court could compare a juror struck with jurors not struck; it could point to disparities in the State's questioning; or it could identify history showing the State's use of discriminatory peremptory strikes in similar cases. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). But even if that's what the court meant to say, that does not help Woods. For the court eventually did what the law required. It accepted that Woods made out his prima facie case, it required the State to offer its race-neutral explanation, and it evaluated the validity of that explanation.

But wait, Woods says: The State's race-neutral explanation came too late because by that point the court had already dismissed Juror #7. So if the court *had* found the State's race-neutral explanation unpersuasive, it no longer would have had the option to "disallow the discriminatory challenge[] and resume selection with the improperly challenged juror[] reinstated on the venire." *Batson*, 476 U.S. at 99 n.24. That's a fair concern. But Woods overlooks another remedy the court could have applied: "discharg[ing] the venire and select[ing] a new jury from a panel not previously associated with the case." *Id.* That approach would have wasted time and plenty of judicial resources, to be sure. But because it would not have violated Woods' constitutional rights, he cannot use the scenario to secure relief.

Woods reminds us that *Batson* errors are structural. *See United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012). But here, there is no error at all. The State properly exercised its peremptory strike. And because the state court followed *Batson*, the court properly empaneled Woods' jury. This claim thus does not get off the ground.

We affirm.