NOTICE
Decision filed 12/21/20,
corrected 2/1/21. The text of
this decision may be changed
or corrected prior to the filing of
a Petition for Rehearing or the
disposition of the same.

2020 IL App (5th) 160454

NO. 5-16-0454

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Alexander County. |
| | ) | |
| v. | ) | No. 15-CF-35 |
| | ) | |
| MARQUAD HARRIS, | ) | Honorable |
| | ) | Mark H. Clarke, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Welch and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Marquad Harris was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)). The jury also found that defendant personally discharged a firearm that proximately caused the death of Christopher Nelson (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)). Defendant was 18 years old at the time of the offense. Following a sentencing hearing, the trial court sentenced defendant to 51 years in the Illinois Department of Corrections (IDOC). On appeal, defendant challenges both his conviction and sentence. First, defendant argues that the admission of the dying declaration by the victim, Nelson, violated defendant's sixth amendment right to confront witnesses against him, where Nelson identified the defendant as the shooter. Next, defendant claims that his case should be remanded for a new trial because the testimony of a newly discovered witness provides defendant with an alibi defense. In his final

1

challenge to his conviction, defendant asserts that he was denied a fair and impartial trial because the jury's foreman had a work and familial relationship with Nelson's father. In challenging his sentence, defendant submits that his 51-year sentence is a *de facto* life sentence and violates the Illinois proportionate penalties clause. For the following reasons, we affirm defendant's conviction and sentence.

¶ 2                                      I. BACKGROUND

¶ 3                                   A. Pretrial Proceedings

¶ 4      On June 16, 2015, the State charged the defendant by information with five counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) related to the shooting death of Nelson. Each count of the criminal information charged a different theory of first degree murder. Count I alleged that defendant intended to kill Nelson. Count II alleged that defendant intended to cause Nelson great bodily harm. Count III alleged that defendant knew shooting Nelson would cause his death. Count IV alleged that defendant knew that shooting Nelson created a strong probability of death and caused the death of Nelson. Finally, count V alleged that defendant knew that shooting Nelson created a strong probability of great bodily harm and caused the death of Nelson. The information also indicated that the State sought a sentencing enhancement, alleging that defendant personally discharged a firearm that proximately caused Nelson's death (720 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)).

¶ 5      Prior to trial, the State filed a "Motion *in Limine* to Introduce Dying Declaration." The motion *in limine* alleged that Nelson made a statement to police, while Nelson knew he was dying, and that the statement implicated defendant as the individual who shot Nelson. Nelson subsequently died as a result of the gunshot wounds. At the hearing on the motion *in limine*, trial counsel conceded that Nelson's statements to police identifying defendant as the shooter were

2

admissible as an exception to the hearsay rule. The trial court granted the State's motion *in limine* but indicated that the State would still be required to lay an adequate foundation at trial before Nelson's statements could be admitted into evidence. At two other pretrial hearings, the trial court inquired of defendant as to whether he would be calling any witnesses in his defense. Defendant confirmed that he had talked with his attorney about the decision not to call any witnesses in defendant's case and that defendant agreed with the decision.

¶ 6                                B. Jury Trial

¶ 7     The case proceeded to a jury trial on March 8, 2016. During *voir dire*, the trial court, the State, and defense counsel each asked questions of the entire jury panel. One of the panel members, Hubert Pirtle, ultimately was selected as a juror to serve on defendant's case. Mr. Pirtle is the subject of one of defendant's claims on appeal. During the trial court's questioning, Pirtle revealed that he was retired from the "Bunge" company, after 37 years, and was a pastor. The trial court asked, generally of the panel, whether anyone on the entire panel of veniremen knew the victim, Nelson, or had heard or read anything about the case. Pirtle did not respond to these questions. Finally, the trial court asked the venire panel:

> "Do any of you know of any reason, whether I've asked you about it or not, whether because of some experience in life or association, personal or professional or otherwise, do any of you know of any reason why you should not serve as a juror in this case this week? Any concerns about your ability to serve, whether I've asked you about it or not, you should volunteer that information now so that we can talk about it."

Again, Pirtle did not respond to the trial court's inquiry. The trial court, the State, and the defense all failed to ask whether the members of the panel knew any of Nelson's family members.

¶ 8    During the evidentiary portion of the trial, the following evidence was produced. On June 12, 2015, at 9:25 p.m., members of the Cairo Police Department, including Office Kenneth Blackburn, responded to a shooting call at the residence of Christopher Nelson. Officer Blackburn testified that he entered the kitchen through the rear door, and Nelson was lying on the kitchen floor "squirming around." Nelson had suffered several gunshot wounds. Officer Blackburn testified that as he was caring for Nelson, he said "he was shot by Marquad Harris, A[imee] Harris' son." Officer Blackburn also testified that Nelson stated that he was dying. Body camera footage that had captured the interaction between Officer Blackburn and Nelson was admitted into evidence without objection from defense counsel. According to the body camera footage, the following exchange occurred:

"OFFICER BLACKBURN: Keep that arm right here.

VICTIM: I'm gonna die.

OFFICER BLACKBURN: No, you're not buddy, just keep breathing for me. Ok?

Who shot you?

VICTIM: Marquad Harris.

OFFICER BLACKBURN: Marquad Harris?

VICTIM: Aimee Harris's son.

OFFICER BLACKBURN: Where'd he go?

VICTIM: He took off runnin' [*sic*].

OFFICER BLACKBURN: What'd he shoot you with?

4

VICTIM: I don't know.

OFFICER BLACKBURN: Was it a handgun?

VICTIM: Yeah.

OFFICER BLACKBURN: Just keep breathing for me ok? Keep talking to me too, alright?"

Officer Blackburn testified that he believed Nelson was coherent when Nelson answered Officer Blackburn's questions.

¶ 9    Officer Barbie Braddy testified that she interviewed Nelson's eight-year-old son, C.N. Jr. (C.J.), on the night of June 12, 2015. C.J. was in the house at the time of the shooting and was also the defendant's half-brother. The recorded interview was admitted into evidence. During the interview, C.J. stated that defendant came to Nelson's house "around dark," and defendant and C.J. played basketball. Defendant and Nelson subsequently got into an argument, and the defendant left. According to C.J., he and Nelson then went into the house. Defendant returned, and Nelson went to confront the defendant. C.J. stated that he saw the defendant shoot Nelson with a pistol three times. C.J. stated that Nelson was holding a "shotgun" by his side but never pointed it at the defendant. C.J. called the police and told them his father had been shot.

¶ 10   At trial, C.J. testified that he normally goes to bed around 9 p.m. and was in bed when defendant came to Nelson's house "a little before sunset." C.J. then went outside to play basketball with the defendant. C.J. stated that defendant and Nelson started arguing, and defendant left the house. C.J. claimed that "some other dude" then came to the house a few minutes after the defendant left and shot Nelson. C.J. stated that he could not see the shooter because it was dark outside. C.J. acknowledged that he previously told police that defendant shot

5

Nelson but indicated that his former statement was not true. C.J. testified that he told police the first statement because Nelson told C.J. that defendant shot Nelson.

¶ 11    Officer Shawn Stone testified that he arrived at Nelson's house at 9:25 p.m. and observed shell casings and shattered glass on the porch and rear interior door of the house. Officer Stone spoke to C.J., who said that "his brother shot his dad." C.J. identified his brother as the defendant. Officer Stone collected shell casings and a pellet gun that resembled a rifle, lying near the victim. Officer Stone later received a call at 10:28 p.m. stating that officers had a suspect in custody at the McBride housing complex (McBride). Officer Stone went to that location and transported the defendant to the police department.

¶ 12    Officer Jerren Carlton testified that he received a call to patrol the area and search for the defendant, who was a suspect in a shooting. Officer Carlton went to McBride because he had seen the defendant there earlier in the day and had briefly spoken with him. Upon his arrival to McBride, Officer Carlton saw the defendant walking alone and arrested him. The defendant did not resist arrest and was cooperative. When he arrested the defendant, Officer Carlton found a key and cell phone in defendant's pockets. Officer Carlton placed the items on the hood of his car but forgot to remove them when he left the area. He subsequently returned, with other officers, to search for the key and phone but could not locate the items.

¶ 13    Officer Ray Sutton, a crime scene investigator, identified several pictures of the crime scene and a computer-generated diagram he had created to provide an "orientation of the rooms in the house" to indicate where Officer Sutton located various items of evidence. Officer Sutton testified that he had collected four discharged cartridge casings and a pellet gun from Officer Stone. Officer Sutton also recovered a projectile fragment on the porch and a projectile from the inside of the rear kitchen door. Officer Sutton swabbed areas in the kitchen that had red stains,

6

which appeared to be blood. Officer Sutton then attended the autopsy, where he took several photographs of the victim's body and collected two projectiles that were removed from the victim. Finally, Officer Sutton collected defendant's clothing from the night of his arrest, which included a red T-shirt, tan cargo shorts, a brown belt, and two red tennis shoes. Officer Sutton confirmed that the police lab had tested the defendant's clothing and shoes for glass, and that the tests were negative. Scott Rochowicz, a forensic scientist, tested defendant's T-shirt for gunshot residue, and the results were also negative.

¶ 14    Dr. James Jacobi testified that he performed the autopsy on Nelson's body. Dr. Jacobi testified that Nelson suffered gunshot wounds to his upper chest on the left side of his body, as well as to his abdomen, near the left side of his navel, and to his right thigh, his right pelvis, and his left wrist. The bullet that entered Nelson's abdomen traveled upward, into his right lung. Dr. Jacobi testified that the cause of death was "massive loss of blood" from this injury. Dr. Jacobi further opined that Nelson lost enough blood to lose consciousness within a couple of minutes, "possibly longer, possibly less." Dr. Jacobi stated that Nelson would have been able to speak, until he passed out from loss of blood, and that there was no reason Nelson could not be coherent, at least initially.

¶ 15    Trooper Tim McDaniel interviewed the defendant regarding the shooting. Prior to interviewing the defendant, Trooper McDaniel read the defendant his *Miranda* rights. The defendant signed a written form, indicating that he understood those rights. The defendant's interview was recorded and admitted into evidence. During his interview, the defendant claimed he was at McBride when the shooting occurred and provided the names of different people he claimed were near him at the time. The defendant initially stated that he had gone to Nelson's house to play basketball with C.J. between 6 p.m. and 7 p.m. The defendant stated that, after he

7

left Nelson's house and went to McBride, he heard "two to three" gunshots "one to two hours" after returning to McBride. The defendant later indicated that he was playing basketball with C.J. at Nelson's house "probably an hour" before the shooting. The defendant denied returning to Nelson's house after defendant left and maintained that he did not shoot Nelson.

¶ 16    The defendant also stated that Nelson had issues with a neighbor named "Nepo" but could not state whether Nepo was involved in the shooting. The defendant subsequently told police that Nelson had pulled a gun on defendant before he left Nelson's house. The defendant claimed he told an associate of his, Mace Paris, what had happened and provided Paris with the location of Nelson's house. The defendant allegedly told Paris not to worry about the situation, but Paris went to Nelson's house to "holler" at him. Paris later called the defendant and told him "what [Paris] did." The defendant claimed that he and Paris looked alike. The interview subsequently terminated. The interview began at 1:14 a.m. and concluded at 4:30 a.m.

¶ 17    Finally, Angela Horn, a forensic scientist, testified that each of the bullets recovered were of the same caliber and had the same general rifling characteristics, but were not suitable for comparison to each other. The bullets were also of the same class as the shell casings. Horn confirmed that the bullets were likely fired from the same gun but did not have a gun to determine whether the bullets were fired from any particular weapon.

¶ 18    Subsequent to the conclusion of the State's case-in-chief, the defendant testified in his own defense. The defendant maintained that he did not shoot Nelson. The defendant affirmed that he did not have any issues with Nelson and considered him a friend. The defendant could not provide the names of anyone defendant was with during the time of the shooting because he was "generally in a large group of folks that night." The defendant further admitted that the statements he made to police about Mace Paris and about Nelson pulling a gun on the defendant

8

were not true. The defendant claimed that he was tired, under the influence of marijuana, and felt bullied and pressured when he gave the interview.

¶ 19 Following deliberations, the jury found the defendant guilty of first degree murder. The jury also found that the defendant personally discharged a firearm that proximately caused Nelson's death.

¶ 20                                    C. Posttrial Proceedings

¶ 21 After trial, the defendant raised concerns regarding the adequacy of his trial counsel. The trial court conducted an inquiry in accordance with the guidelines of *People v. Krankel*, 102 Ill. 2d 181 (1984). Following the hearing, Donna McCann,[1] was appointed as new counsel for the defendant. With new posttrial counsel, the defendant filed a "Motion for Judgment Notwithstanding the Verdict or a New Trial." In his posttrial motion, the defendant made several challenges to his conviction. The defendant submitted, *inter alia*, that (1) the admission of Nelson's dying declaration violated the defendant's sixth amendment right to confrontation, (2) newly discovered evidence would probably change the result on retrial, and (3) defendant was denied a fair trial because juror Hubert Pirtle did not disclose that he had a work and familial relationship with Nelson's father. Counsel attached a statement from a new witness, Kenyatta Jones, to the motion. In the statement, Jones stated that she saw defendant at McBride on June 12, 2015, and told Officer Carlton that defendant had not done anything wrong and had been at McBride. According to the statement, Officer Carlton did not respond to Jones but returned to McBride later to ask if anyone had seen keys and a phone. The State filed an answer and accompanying brief in opposition to the defendant's posttrial motion. The trial court set the posttrial motion for hearing.

_____

[1]The record reveals that defendant was also represented by Patrick McCann of the law firm McCann and McCann. We will collectively refer to both Donna McCann and Patrick McCann as "posttrial counsel" unless a distinction is necessary.

9

¶ 22    At the hearing on the posttrial motion, the defendant called several witnesses. Officer Blackburn, who had also testified at trial, testified about his interaction with Nelson when Officer Blackburn arrived on the scene. This interaction had been captured on his body camera, and the video footage was admitted into evidence at the defendant's trial. Officer Blackburn testified that he asked Nelson who shot him in order to identify a suspect and "bring justice" for Nelson's murder. When Officer Blackburn was talking to Nelson, Officer Blackburn was concerned that someone might have a gun in town, and Officer Blackburn did not know the whereabouts of that individual. Officer Blackburn affirmed that Nelson did not have any trouble speaking or verbalizing. At the scene of the shooting, Officer Blackburn was not rendering medical treatment to Nelson and was waiting for first responders to arrive.

¶ 23    Kenyatta Jones testified that she lived in McBride. Jones was also being represented by posttrial counsel Donna McCann in an unrelated child custody case. Jones testified that on June 12, 2015, she was at McBride with a group of people and saw the defendant prior to seeing and hearing police and ambulance sirens passing by McBride. Jones did not know defendant personally, but knew of him and knew his name. Jones stated that the defendant had been present "long before" the sirens. Jones stated that she could not provide a specific time but believed the defendant was at McBride "for a few hours." Jones admitted that she could not account for the defendant's whereabouts at all times but claimed that the defendant was at McBride the entire time she was there. Jones asserted that, when the defendant was being arrested by Officer Carlton, she told Officer Carlton that the defendant "had been in the projects this whole time." Jones stated that Officer Carlton did not respond to her and left with the defendant. She testified that Officer Carlton later returned and asked if anyone had seen keys and a cell phone. Following that evening, Jones never made any statements to the police, the State, or a defense attorney

10

regarding what she had witnessed. Despite knowing the defendant was in jail, she never came forward during the pendency of the defendant's case. After the trial, following a conversation with one of Nelson's family members, Jones decided to come forward. She then informed her attorney, posttrial counsel Donna McCann, of what she knew and was encouraged to make a statement.

¶ 24    With regard to juror Pirtle, Melvin Davis testified that he was Nelson's father and had been married to Pirtle's half-sister. During this marriage, Davis did not know Pirtle. According to Davis, he was only married to Pirtle's sister for eight months and estimated the divorce was finalized "a year or year and a half after that." Nelson was not born until after this marriage, and Davis confirmed that Pirtle was never an uncle to Nelson. Davis did not meet Pirtle until Davis began working at Bunge. Further, while at Bunge, Davis worked in the processing department and Pirtle operated the boiler. Davis estimated that 6 of the 60 workers at Bunge were black, including Pirtle, and Davis knew them all. Davis testified that he sometimes ate lunch with Pirtle and filled in for Pirtle occasionally, when needed. Davis and Pirtle were members of the same union but did not work on union issues together. Davis only considered his fellow employees as coworkers and stated that he and Pirtle did not socialize outside of work together.

¶ 25    Tara Harris, the defendant's aunt, testified that she did not attend the jury selection portion of the defendant's trial. Tara attended the remainder of the trial and recognized Pirtle. Tara stated she knew that Pirtle worked with Davis at Bunge. Before closing arguments, Tara informed trial counsel of Pirtle and Davis's work relationship. Tara testified that trial counsel told her that he believed there was reasonable doubt and "figured he would win."

¶ 26    Hubert Pirtle also testified regarding his work and familial relationship with Davis. Pirtle stated that he had worked at Bunge for 37 years, and knew Davis, although they worked in

11

different departments. Pirtle did not believe that Davis would fill in for Pirtle when he went on vacation. Pirtle also stated that he and Davis were members of the same union and that he "knew all the blacks" who worked at Bunge. Pirtle testified that he did not socialize with Davis outside of work and generally saw Davis at union meetings or mandatory safety meetings. When asked if Pirtle knew that Nelson worked at Bunge, Pirtle stated he did not. Pirtle also confirmed that he did not know Nelson when he was alive. Regarding the marriage to Pirtle's sister, Pirtle knew that she had been married to Davis, but did not know Davis during that time. During their marriage, Pirtle did not spend time with either his sister or Davis. Pirtle indicated that he realized Nelson was Davis's son during *voir dire*, when he saw Davis in the courtroom with a woman Pirtle recognized. Pirtle recalled that Davis and the woman had been together and had children in the past. Pirtle then came to the belief that Davis was Nelson's father. Pirtle did not inform the trial court or anyone else that he knew Davis because Pirtle did not believe it affected his ability to remain impartial.

¶ 27 Aimee Harris, defendant's mother, testified that she had been married to Nelson and knew Pirtle from living in Cairo, Illinois. Aimee claimed that Nelson worked at Bunge in 2006 and that Pirtle gave Nelson a ride home from work one evening.

¶ 28 The State did not present any witnesses but requested that the court admit into evidence certified copies of the marriage license and the judgment of dissolution of marriage between Davis and Pirtle's sister. The documents showed that Davis and Pirtle's sister married on September 18, 1975, and their marriage was dissolved on September 17, 1979. After hearing the parties' arguments, the trial court took the matter under advisement.

¶ 29 The trial court subsequently entered a written order denying the defendant's posttrial motion for a new trial. In the trial court's order, the trial court found, *inter alia*, that Nelson's

12

statements were admissible as a dying declaration and did not violate defendant's sixth amendment right to confrontation because the statements were made during an ongoing emergency and were not testimonial. Regarding the defendant's claim that he did not receive a fair trial because of Pirtle's alleged partiality, the trial court found that Pirtle provided credible testimony and that his prior association with Davis did not affect his ability to serve as a fair and impartial juror. The trial court also found Amiee's testimony that Pirtle knew Nelson was not credible. Finally, the trial court found that Jones's testimony was not credible, was inconsistent with both the statements made to the police by the defendant and C.J., and was inconsistent with C.J.'s trial testimony. The trial court concluded that Jones's testimony was not of such a conclusive character that it would probably change the result at a new trial.

¶ 30    After the trial court denied the defendant's posttrial motion, the defendant filed a "Supplemental Motion for a New Trial" and an "Amended Supplemental Motion for a New Trial." In these motions, the defendant made several claims that are not the subject of this appeal. The trial court held a hearing on these motions and again denied the defendant's request for a new trial.

¶ 31                                 D. Sentencing

¶ 32    Prior to sentencing, a presentence investigation report (PSI) was submitted to the court. The PSI contained information concerning the defendant's offense information, juvenile and adult criminal history, education and employment history, marital and family information, substance abuse history, and physical and mental health history, as well as a statement from the defendant. Attached to the PSI were records relating to the defendant's history and a victim impact statement.

13

¶ 33    At sentencing, the defendant offered evidence in mitigation. The defendant submitted that he had only a prior juvenile offense for possession of marijuana. At the age of 11, the defendant had been removed from his home because of a domestic dispute between his mother and Nelson. The defendant had also attended counseling following the death of his uncle, who the defendant had considered a "father figure." In school, the defendant attended Johnson, Alexander, Massac, and Pulaski (JAMP) special education services and had an individualized education plan with a disability listed as emotional disturbance. Jeffrey Chiles, the husband of the defendant's grandmother, testified that when the defendant lived with his grandmother, Chiles did not have any trouble with the defendant, and that the defendant was a "model kid." Dr. Andrea Evers, the superintendent of the Cairo School District, testified that she had "hundreds" of interactions with defendant. Dr. Evers never had any problems with the defendant, other than an altercation he had when property was stolen from him.

¶ 34    Following the presentation of evidence, the State requested that the trial court sentence defendant to 60 years in IDOC. Posttrial counsel "encourage[d] the court to go with the minimum sentence of 45 years"—the mandatory minimum sentence under the statutory scheme. In sentencing the defendant, the trial court found that the defendant's lack of a criminal record was a significant mitigating factor. The trial court also found that the defendant had "lived a life, prior to this incident, that is worthy of qualifying, for the various statutory factors in mitigation that have been cited by the defense." The trial court went on to state that the court was "going to impose a sentence that provide[d] a little more credit for the factors in mitigation" than the State recommended. The trial court then sentenced defendant to 51 years in IDOC, 26 years for first degree murder plus 25 years for the mandatory firearm enhancement. This appeal followed.

¶ 35                              II. ANALYSIS

¶ 36    On appeal, the defendant asserts several challenges to his conviction. First, the defendant

asserts that the admission of Nelson's statements, identifying him as the shooter, violated

defendant's sixth amendment right to confrontation. Next, the defendant contends that newly

discovered evidence, the testimony of Jones, provides the defendant with an alibi defense that

would likely change the result at a new trial. The defendant also claims that he was denied a fair

and impartial trial because Pirtle did not reveal during *voir dire* that he had a prior work and

familial relationship with Nelson's father. Finally, the defendant argues that his 51-year sentence

to IDOC is a *de facto* life sentence that violates the Illinois proportionate penalties clause.

¶ 37                      A. Admission of Dying Declaration

¶ 38    Before we address the argument that the admission of Nelson's statements identifying

defendant as the shooter violated his sixth amendment right to confrontation, we must first

address whether this claim has been preserved for our review. Generally, to properly preserve a

claim for appeal, the defendant must both object at trial and include the claim of error in the

defendant's posttrial motion. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). The purpose of the

waiver doctrine is to enable the reviewing court to have the benefit of the trial court's judgment

on an issue. *People v. Clark*, 108 Ill. App. 3d 1071, 1077 (1982). A reviewing court, however,

may exercise its discretion and consider an issue on appeal when it has been brought to the trial

court's attention in some manner. *People v. Maness*, 184 Ill. App. 3d 149, 152 (1989). Therefore,

preservation of issues for review may be accomplished by a proper objection during trial or by

making the argument in a posttrial motion. *Clark*, 108 Ill. App. 3d at 1077.

¶ 39    Prior to trial, the State filed a motion *in limine*, seeking to introduce Nelson's statements

to the police, identifying the defendant as the shooter, under the "dying declaration" exception to

15

the hearsay rule. At the hearing on the State's motion *in limine*, trial counsel conceded that Nelson's statements were admissible as an exception to the hearsay rule. Accordingly, trial counsel made no objection to the introduction of Nelson's statements at trial. In his posttrial motion, defendant claimed that the introduction of Nelson's statements violated defendant's sixth amendment right to confrontation. The trial court held a hearing on the posttrial motion, and the defendant called Officer Blackburn to testify regarding the questions he asked Nelson that elicited the incriminating information. Following the hearing, the trial court entered a written order, which found that Nelson's statements did not violate the defendant's right to confrontation and were not testimonial because the statements were made during an ongoing emergency.

¶ 40    Here, we have the benefit of a developed record on defendant's argument concerning Nelson's statements and the trial court's ruling on the statement's admissibility, *albeit* posttrial. Also, the State has not argued on appeal that defendant failed to properly preserve this issue for review. Therefore, in the exercise of our discretion, we will review defendant's claim on its merits.

¶ 41    Defendant contends that the admission of Nelson's dying declaration, identifying the defendant as the shooter, violated defendant's sixth amendment right to confrontation. Defendant argues that these statements were testimonial, and defendant had no prior opportunity to challenge the statements on cross-examination. Defendant also argues that dying declarations are "incompatible" with the right to confrontation as discussed in the United States Supreme Court decision of *Crawford v. Washington*, 541 U.S. 36 (2004).

¶ 42    Before we may proceed to defendant's constitutional challenge, we must consider whether Nelson's statements were admissible as an evidentiary matter. *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 41. A dying declaration is a statement of fact made by the victim about

16

the cause or circumstances of the homicide. *People v. Gilmore*, 356 Ill. App. 3d 1023, 1031 (2005). Illinois Rule of Evidence 804(b)(2) (eff. Jan. 1, 2011) provides that in a prosecution for a homicide, a dying declaration is an exception to the hearsay rule where the statement is "made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." A dying declaration qualifies as an exception to the hearsay rule because it "poses a guarantee of trustworthiness based on the assumption that the belief of impending death excludes the possibility of fabrication by the declarant." *Gilmore*, 356 Ill. App. 3d at 1031. Reviewing courts are reluctant to overturn the trial court's ruling on a dying declaration unless the trial court's decision is against the manifest weight of the evidence. *Gilmore*, 356 Ill. App. 3d at 1033-34.

¶ 43 To admit a statement as a dying declaration, the proponent must show, beyond a reasonable doubt, that (1) the declaration pertained to the cause or circumstances of the homicide, (2) the declarant believed death was imminent, and (3) the declarant was mentally capable of giving an accurate statement regarding the cause or circumstances of the homicide. *People v. Graham*, 392 Ill. App. 3d 1001, 1006 (2009). Here, police arrived at Nelson's residence and found him lying on the floor suffering from gunshot wounds. Nelson uttered, "I'm gonna die." After offering Nelson reassurances, Officer Blackburn asked Nelson, "Who shot you?" Nelson replied, "Marquad Harris *** A[imee] Harris's son." Nelson was also able to state that the defendant "took off runnin' [*sic*]" and describe that the defendant used a handgun to shoot Nelson.

¶ 44 Nelson's statements fall squarely within the "dying declaration" exception to the hearsay rule. Nelson clearly made the statements under the belief that death was imminent. Nelson had suffered several gunshot wounds and expressed the belief he was dying. The statements—

17

concerning who shot him, where the shooter went, and the type of firearm used to shoot him—all pertained to the cause and circumstances of his death. Finally, although Nelson was suffering from gunshot wounds, the evidence does not suggest that he was mentally incapable of accurately answering Officer Blackburn's questions. Thus, Nelson's statements were admissible as a dying declaration.

¶ 45 Having determined that Nelson's statements qualified as a dying declaration, we now consider whether the admission of the dying declaration into evidence at defendant's trial violated his sixth amendment right to confrontation. We review this claim *de novo*. *Graham*, 392 Ill. App. 3d at 1007. Both the United States and Illinois Constitutions guarantee the defendant's right to confront witnesses against him. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. In *Crawford*, the United States Supreme Court held that testimonial hearsay statements may not be admitted into evidence against an accused unless (1) the witness is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 53-54. While examining the historical basis for the confrontation clause and exceptions to the hearsay rule, the Supreme Court noted that "there is scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case." (Emphases in original.) *Crawford*, 541 U.S. at 56. However, the Supreme Court continued in a footnote:

"The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citations.] Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations.] We need not decide in this case whether the Sixth Amendment incorporates an exception

18

for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*." *Crawford*, 541 U.S at 56 n.6.

¶ 46 Following the *Crawford* decision, the Second District considered the *Crawford dicta* found in the footnote "as a strong indication that the [Supreme] Court does not believe that admitting testimonial dying declarations violates the confrontation clause." *Gilmore*, 356 Ill. App. 3d at 1032. The Second District also considered a case from the California Supreme Court, which ruled that the "dying declaration" exception to the hearsay rule existed at common law and therefore was not repudiated by the sixth amendment. *Gilmore*, 356 Ill. App. 3d at 1032 (citing *People v. Monterroso*, 101 P.3d 956, 971-72 (Cal. 2004)). The *Monterroso* court reasoned that

> "if, as *Crawford* teaches, the confrontation clause 'is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' [citations], it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." *Monterroso*, 101 P.3d at 972 (quoting *Crawford*, 541 U.S. at 54).

Accordingly, the Second District concluded that, in the context of a dying declaration, "there is no constitutional impediment to admitting [the declarant's] statements." *Gilmore*, 356 Ill. App. 3d at 1033.

¶ 47 Four years after Supreme Court decided *Crawford*, the Supreme Court in *Giles v. California*, 554 U.S. 353 (2008), referred to the *Crawford* footnote and, again, acknowledged the "dying declaration" exception to the hearsay rule. The Supreme Court stated: "We have previously acknowledged that two forms of testimonial statements were admitted at common law

19

even though they were unconfronted. [Citation.] The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. [Citations.]" *Giles*, 554 U.S. at 358. When discussing the relevant common law, the *Giles* Court stated:

> "In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying declarations exception." *Giles*, 554 U.S. at 361-62.

¶ 48 Following the *dicta* in both *Giles* and *Crawford* and the Second District's ruling in *Gilmore*, the First District found that the admission of a testimonial dying declaration did not conflict with the sixth amendment. See *Graham*, 392 Ill. App. 3d at 1008. Other state supreme courts have also recognized that dying declarations do not conflict with the right to confrontation post-*Crawford*. See *Davis v. State*, 207 So. 3d 142, 162 (Fla. 2016) ("The unique nature and purpose of the dying declaration exception, observed in *Crawford* and *Giles*, justifies its continuing utility and validity as an exception to the rule against hearsay."); *People v. Johnson*, 353 P.3d 266, 288-89 (Cal. 2015); *State v. Young*, 710 N.W.2d 272, 283-84 (Minn. 2006); *Harkins v. State*, 143 P.3d 706, 710-11 (Nev. 2006); *People v. Clay*, 926 N.Y.S.2d 598, 608-09 (App. Div. 2011); *State v. Lewis*, 235 S.W.3d 136, 146-50 (Tenn. 2007); and *State v. Beauchamp*, 2011 WI 27, ¶ 31, 796 N.W.2d 780. Recently, the United States Court of Appeals for the Sixth Circuit recognized that dying declarations did not conflict with Supreme Court precedent. See *Woods v. Cook*, 960 F.3d 295, 300 (6th Cir. 2020) ("[W]e cannot fault state courts for continuing to do what the U.S. Supreme Court has acknowledged they may be able to do after *Crawford* ***.").

20

¶ 49    We find no reason to depart from the decisions in *Gilmore* and *Graham* finding that the admission of dying declarations do not offend the sixth amendment confrontation clause. The *dicta* in *Crawford* and *Giles*, the decisions of other state supreme courts, and the Sixth Circuit's recent opinion support our position. Because we find that dying declarations do not violate the sixth amendment right to confrontation, we need not further discuss whether Nelson's dying declaration was testimonial, as this issue is subsumed by our prior discussion.

¶ 50    Finally, defendant now claims that his trial counsel was ineffective for failing to object to the admission of the dying declaration at trial. Our holding as to this issue renders defendant's claim of ineffective assistance of counsel moot, and there is thus no need to address it further.

¶ 51                    B. Newly Discovered Evidence

¶ 52    Defendant next argues that he should be granted a new trial because a newly discovered witnesses provided an alibi that would likely change the result at a new trial. Newly discovered evidence warrants a new trial when the evidence (1) has been discovered after trial, (2) could not have been discovered prior to trial through the exercise of due diligence, (3) is material to the issue and not merely cumulative, and (4) is so conclusive that it will probably change the result upon retrial. *People v. Rush*, 294 Ill. App. 3d 334, 343 (1998). Motions for a new trial based on newly discovered evidence are not looked upon favorably by the courts and must be closely scrutinized. *Rush*, 294 Ill. App. 3d at 344. The decision to grant a new trial based on newly discovered evidence is within the sound discretion of the trial court and will not be disturbed absent a showing that the trial court abused its discretion. *Rush*, 294 Ill. App. 3d at 344.

¶ 53    Defendant argues that Jones's testimony provided defendant with an alibi. Jones testified at the hearing on defendant's posttrial motion that she saw defendant at McBride on June 12, 2015, prior to hearing or seeing any police and ambulance sirens. While she could not provide

specific times, Jones claimed that defendant was at McBride for a "few hours" and that defendant was at McBride the whole time Jones was there. Jones admitted, however, that she could not account for defendant's whereabouts at all times on the evening in question.

¶ 54   Jones's testimony that the defendant was at McBride the entire time Jones was there is inconsistent with the evidence presented at trial. Police responded to the shooting at 9:25 p.m. In his statement to police, the defendant admitted that he went to Nelson's house to play basketball with C.J. between 6 p.m. and 7 p.m. The defendant later indicated he was playing basketball with C.J. at Nelson's house approximately an hour before the shooting. At trial, C.J. testified that he normally goes to bed around 9 p.m. and was in bed when defendant came to Nelson's house "a little before sunset." C.J. then went outside with defendant to play basketball with defendant. Subsequently, defendant and Nelson got into an argument, and defendant left Nelson's house. C.J. further testified that his father was shot a few minutes after defendant left the house. In his statement to police, C.J. stated that defendant came to Nelson's house "around dark," and C.J. and defendant played basketball. Defendant left Nelson's house after getting into an argument with Nelson. C.J. further stated that the defendant left Nelson's house and returned with a pistol. C.J. then witnessed defendant shoot Nelson.

¶ 55   Jones's testimony does not, as defendant claims on appeal, provide him with an alibi. Jones provided only general testimony that she saw defendant at McBride a few hours prior to hearing or seeing any sirens. According to the evidence presented at trial, however, the defendant could not have been at McBride the entire time Jones was there, as she claimed, because defendant went to Nelson's house to play basketball that evening. Moreover, the trial court had the opportunity to view Jones's live testimony and found that Jones was not credible. This

22

credibility determination is best left to the trial court. *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1036 (2011).

¶ 56    Considering Jones's generalized testimony, the evidence presented at trial, and the trial court's credibility determination, we cannot say Jones's testimony would probably change the result at a new trial. Based on the record before this court, we cannot say that the trial court abused its discretion in denying defendant's motion for a new trial based on newly discovered evidence.

¶ 57                              C. Juror Impartiality

¶ 58    In his final challenge to his conviction, defendant claims that he did not receive a fair and impartial trial because the jury's foreman, Hubert Pirtle, did not reveal during *voir dire* that he had a familial and work relationship with Nelson's father. Defendant argues that this relationship affected Pirtle's ability to serve as an impartial juror.

¶ 59    Generally, a person is not competent to sit as a juror if their state of mind is such that the defendant will not receive a fair and impartial trial. *People v. Strawbridge*, 404 Ill. App. 3d 460, 465 (2010). The party making the challenge bears the burden of showing that the challenged juror possessed a disqualifying state of mind. *People v. Peeples*, 155 Ill. 2d 422, 463 (1993). Whether to grant a new trial because of a claimed disqualification of a juror is within the sound discretion of the trial court. *People v. Porter*, 111 Ill. 2d 386, 403 (1986). The trial court's determination will not be set aside unless it is against the manifest weight of the evidence. *People v. Cole*, 54 Ill. 2d 401, 414 (1973). A mere suspicion of bias or partiality is insufficient to disqualify a juror. *Porter*, 111 Ill. 2d at 403.

¶ 60    Under the circumstances of this case, we find the decisions of *Porter* and *Strawbridge* provide considerable guidance. In *Porter*, a juror attended the same church as the mother of the

23

victim and did not realize this fact until after " 'it had got started and everything was going on.' " *Porter*, 111 Ill. 2d at 398. The juror indicated that the fact that she went to the same church as the victim's mother " 'made no difference' " to the juror. *Porter*, 111 Ill. 2d at 397-98. The trial court denied the defendant's subsequent motion for a mistrial. *Porter* 111 Ill. 2d at 398. The defendant also raised the issue in his motion for a new trial but did not call the juror or anyone else as a witness to establish the nature of the relationship in question and to show the defendant was prejudiced. *Porter*, 111 Ill. 2d at 403. Our supreme court noted that the record only showed that the juror and the victim's mother attended the same church, which was insufficient to show that the defendant had suffered any prejudice. *Porter*, 111 Ill. 2d at 404.

¶ 61    In *Strawbridge*, the victim indicated, during a break in her direct testimony at trial, that she knew one of the jurors. *Strawbridge*, 404 Ill. App. 3d at 466. The victim told the court that she was in a church youth group with the juror, but that they were in different school-aged groups. *Strawbridge*, 404 Ill. App. 3d at 466. The victim indicated that they had never actually met but would say "hi" if they passed each other. *Strawbridge*, 404 Ill. App. 3d at 466. The victim estimated she had seen the juror two or three times. *Strawbridge*, 404 Ill. App. 3d at 466.

¶ 62    Following the victim's testimony, the trial court questioned the juror, who acknowledged she recognized the victim. *Strawbridge*, 404 Ill. App. 3d at 466. The juror indicated that she knew the victim from church but did not know the victim " 'very well' " and did not recognize her last name. *Strawbridge*, 404 Ill. App. 3d at 466. The juror stated that she and the victim never socialized at school but interacted at church. *Strawbridge*, 404 Ill. App. 3d at 466. Their interactions consisted of seeing each other at church and chatting " 'for a second.' " *Strawbridge*, 404 Ill. App. 3d at 466. They also shared a mutual friend and would " 'stop and say hey to each other.' " *Strawbridge*, 404 Ill. App. 3d at 466. The juror stated she had seen the victim at church

24

" 'maybe three times at best.' " *Strawbridge*, 404 Ill. App. 3d at 466. The juror told the trial court that the fact that she knew the victim would not affect her ability to be impartial. *Strawbridge*, 404 Ill. App. 3d at 466.

¶ 63 Defense counsel in *Strawbridge* requested that the juror be removed and indicated that counsel "probably" would have moved to strike her during *voir dire* had counsel been aware of the relationship. *Strawbridge*, 404 Ill. App. 3d at 466. The trial court denied this request. *Strawbridge*, 404 Ill. App. 3d at 466. The trial court noted that there was no deceit during *voir dire*, and that the victim and juror were consistent regarding their interactions. *Strawbridge*, 404 Ill. App. 3d at 466. The trial court also credited the juror's assurances that she could remain impartial. *Strawbridge*, 404 Ill. App. 3d at 467. The appellate court held that the trial court's decision not to remove the juror was not against the manifest weight of the evidence or an abuse of discretion. *Strawbridge*, 404 Ill. App. 3d at 467. The defendant in *Strawbridge* attempted to distinguish his case from *Porter* because the victim and the juror actually knew each other. *Strawbridge*, 404 Ill. App. 3d at 467. The appellate court commented that the brief and minimal interactions between the victim and the juror did not truly differentiate the case from *Porter*. *Strawbridge*, 404 Ill. App. 3d at 467.

¶ 64 Here, defendant attempts to distinguish his case from *Porter* because Pirtle and Davis knew each other from work and had a remote familial relationship. While it is true that Pirtle and Davis worked for the same company, under *Porter*, this fact alone is not enough to disqualify Pirtle. See *Strawbridge*, 404 Ill. App. 3d at 467. The record shows that they worked for the same company in different departments and had minimal interaction with each other. Both indicated that they did not often see each other at work and never socialized together outside of work. Furthermore, Davis's marriage to Pirtle's sister is of little, if any, consequence. According to

25

Davis, he was married to Pirtle's sister for only eight months with the divorce being finalized after they split. During this time, Pirtle and Davis had not met each other and did not consider each other "family." In fact, the record does not show that Pirtle even knew Nelson. Pirtle and Davis's minimal interactions at work, and their remote familial relationship, are insufficient to show that Pirtle's impartiality was affected in any way.

¶ 65    Defendant also argues that the work and familial relationships between Pirtle and Davis created an "implied bias" that would disqualify Pirtle. Under the implied bias doctrine, a court must excuse a juror for cause if the juror is related to one of the principals in the case. *United States v. Brazelton*, 557 F.3d 750, 753 (7th Cir. 2009). As we have discussed, Davis's and Pirtle's work relationship was minimal and their familial relationship was remote. We cannot say Pirtle possessed any bias, implied or otherwise. Therefore, the trial court did not abuse its discretion in denying defendant's posttrial motion on this point, and the trial court's decision was not against the manifest weight of the evidence.

¶ 66                        D. Constitutionality of Sentence

¶ 67    Finally, defendant challenges his 51-year sentence under the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). The proportionate penalties clause states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In challenging his sentence, defendant argues that his 51-year sentence constitutes a *de facto* life sentence that violates the proportionate penalties clause because the trial court did not fully consider defendant's youth and its attenuating circumstances. Relying on our supreme court's decision in *People v. Harris*, 2018 IL 121932, the State contends that defendant's challenge is premature because he did not raise this challenge in the trial court. See *Harris*, 2018 IL 121932,

26

¶ 46. In reply, the defendant acknowledged our supreme court's ruling in *Harris* and stated his belief that, under *Harris*, defendant is not foreclosed from raising his as-applied constitutional challenge under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). See *Harris*, 2018 IL 121932, ¶ 48.

¶ 68    Defendant's sentencing challenge is based upon a line of cases affording heightened protections to juveniles in sentencing. See *Roper v. Simmons*, 543 U.S. 551, 574-75 (2005) (eighth amendment prohibits death penalty for juveniles who commit homicide), *Graham v. Florida*, 560 U.S. 48, 82 (2010) (eighth amendment prohibits mandatory life without parole sentences for juveniles who commit nonhomicide offenses), and *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (eighth amendment prohibits mandatory life without parole sentences for juvenile offenders convicted of homicide). Defendant argues that the Illinois proportionate penalties clause affords broader protections than the eighth amendment, and thus, the reasoning from *Roper*, *Graham*, and *Miller* should be extended to his specific circumstances as a young 18-year-old. Defendant's challenge is what is known as an "as-applied" challenge to the constitutionality of the eighth amendment.

¶ 69    In making an as-applied challenge, a defendant must show that the sentencing statute is unconstitutional as it applied to the specific facts and circumstances of his case. *Harris*, 2018 IL 121932, ¶ 38. As-applied challenges are dependent on the specific facts and circumstances of the person raising the challenge; therefore, it is important that the record be sufficiently developed regarding the facts and circumstances of the claim. *Harris*, 2018 IL 121932, ¶ 39. Our supreme court has repeatedly stated that " ' " 'a court is not capable of making an "as applied" determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional

27

"as applied" is premature.' " ' " *Harris*, 2018 IL 121932, ¶ 39 (quoting *People v. Rizzo*, 2016 IL 118599, ¶ 26, quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 70 The circumstances of defendant's sentence are similar to the facts of *Harris*. In *Harris*, the defendant was convicted of first degree murder, attempted first degree murder, and aggravated battery with a firearm and was sentenced to a mandatory minimum aggregate term of 76 years in IDOC. *Harris*, 2018 IL 121932, ¶ 1. At the time of the offenses, the defendant was 18 years and 3 months of age. *Harris*, 2018 IL 121932, ¶ 1. At the defendant's sentencing, the defendant offered evidence in mitigation, which included that the defendant had no prior criminal history, obtained his general education diploma (GED) and several educational achievement certificates while in pretrial custody, and had a stable and supportive family. *Harris*, 2018 IL 121932, ¶ 16.

¶ 71 On appeal, the defendant challenged his 76-year sentence under both the eighth amendment and the proportionate penalties clause. *Harris*, 2018 IL 121932, ¶ 17. The appellate court rejected the defendant's eighth amendment claim but vacated his sentence under the proportionate penalties clause and remanded the case for resentencing. *Harris*, 2018 IL 121932, ¶ 18. Our supreme court reversed the appellate court's decision regarding the defendant's proportionate penalties clause claim because the appellate court did not have a developed evidentiary record and the defendant's as-applied challenge was premature. *Harris*, 2018 IL 121932, ¶ 46. The supreme court expressed its belief that the defendant's constitutional challenge would be more appropriately raised in another proceeding, such as one under the Post-Conviction Hearing Act. *Harris*, 2018 IL 121932, ¶ 48.

¶ 72 Here, defendant was 18 years and 2 months of age at the time of his offense. Defendant was also convicted of first degree murder and found to have personally discharged a firearm that resulted in Nelson's death, thus triggering the sentencing enhancement. At his sentencing hearing, defendant offered evidence in mitigation regarding his background, but did not offer any evidence as to how the emerging science regarding juvenile maturity and brain development that formed the basis for *Miller* applies to him. See *Harris*, 2018 IL 121932, ¶ 46. Moreover, posttrial counsel did not make any constitutional challenge to defendant's sentence. Rather, posttrial counsel "encourage[d] the court to go with the minimum sentence of 45 years." Thus, we have no evidentiary record to support defendant's constitutional claim, and we decline to consider defendant's as-applied constitutional challenge to his sentence. "Consistent with *Harris*, we do not intend for our disposition to preclude defendant from advancing his claim through other available proceedings." *People v. Figueroa*, 2020 IL App (2d) 160650, ¶ 89; see also *Harris*, 2018 IL 121932, ¶ 48.

¶ 73                                III. CONCLUSION

¶ 74 For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 75 Affirmed.

**No. 5-16-0454**

| | |
|---|---|
| **Cite as:** | *People v. Harris*, 2020 IL App (5th) 160454 |
| **Decision Under Review:** | Appeal from the Circuit Court of Alexander County, No. 15-CF-35; the Hon. Mark H. Clarke, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Lawrence J. O'Neill, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | E. Zachary Gowin, State's Attorney, of Cairo (Patrick Delfino, Patrick D. Daly, and Michael R. Lennix, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |