NOTICE
Decision filed 05/26/21. The
text of this decision may be
changed or corrected prior to
the filing of a Peti ion for
Rehearing or the disposition of
the same.

2021 IL App (5th) 170259

NO. 5-17-0259

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 16-CF-85 |
| | ) | |
| TAMON FORD, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court, with opinion.
Justice Welch concurred in the judgment and opinion.
Justice Wharton dissented, with opinion.

**OPINION**

¶ 1    Following a bench trial, the defendant, Tamon Ford, was convicted of first degree murder (720 ILCS 5/9-1(a), (b) (West 2016)). The defendant was 18 years old at the time of the offense. The trial court sentenced the defendant to an aggregate term of 55 years in the Illinois Department of Corrections (IDOC). On appeal, the defendant challenges the constitutionality of his sentence. Specifically, the defendant argues that he was sentenced to a *de facto* life sentence in violation of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to the defendant. The defendant requests that we vacate his sentence and remand this case for a new sentencing hearing. Alternatively, the defendant requests that this court find his sentence is

1

excessive and exercise our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) to reduce his sentence. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3      A grand jury indicted the defendant on two counts of first degree murder (720 ILCS 5/9-1 (West 2016)). Count I alleged that the defendant, without lawful justification and with the intent to kill or do great bodily harm to the victim, shot the victim by personally discharging a firearm thereby causing the victim's death (720 ILCS 5/9-1(a)(1) (West 2016)). In the alternative, count II alleged that the defendant, without lawful justification, personally discharged a firearm in the direction of the victim knowing that such act created a strong probability of death or great bodily harm to the victim, thereby causing the victim's death (720 ILCS 5/9-1(a)(2) (West 2016)). The relevant facts giving rise to the indictment are as follows.

¶ 4      On January 11, 2016, the defendant was with his friend D'Marlo Smith smoking marijuana at Smith's house. Their friend, Arthur Hinton, arrived at Smith's house after school. Smith testified that Hinton had been involved in a dispute on Facebook with an individual named Keith Sanders over rap music. Sanders claimed on Facebook that Hinton had "dissed on [Sanders's] block" in Hinton's rap music. The disagreement escalated to the point where Hinton and Sanders wanted to fight. Sanders informed Hinton via Facebook that Sanders would be at the Alton Acres community center. Smith commented on the Facebook post that "we was gonna slide out there and fight." Sanders's friend, Tyrai London, also joined the posts on Facebook and began arguing with Smith. Hinton contacted Christian West, who was with Eric Carter and Jaquon Ammonnette, and asked them to meet at Smith's house. West, Carter, and Ammonnette subsequently arrived at Smith's house in a red car.

2

¶ 5     Once at Smith's house, the defendant and his friends planned to travel to Alton Acres to confront Sanders. Hinton testified that the plan was to scare Sanders by shooting in the air. Both the defendant and Carter had guns. The defendant's gun was loaded with three bullets, but Carter's gun was unloaded. The defendant and his five associates got into the red car and traveled to Alton Acres. Carter drove the car and the defendant sat in the back seat on the driver's side, against the door. When the group arrived at Alton Acres, Carter drove toward Paul Street. After he turned onto Paul Street, Carter increased the speed of his vehicle. As Carter did so, the defendant climbed out of the rear driver's side window and began shooting over the roof of the car toward the Alton Acres community center.

¶ 6     London, who was present in a parking lot near the community center, testified that he heard someone yelling obscenities and then heard gunshots. London saw that the shooter had dreadlocks and was "hanging over" a red car while shooting the gun. Other witnesses also testified that they saw an individual sitting on the rear driver side window of a red car, firing a gun over the roof of the car toward the Alton Acres community center. When London was interviewed by the police, he identified three of the car's occupants: the defendant, Hinton, and Smith. London knew these individuals from high school and indicated that the defendant had dreadlock style hair.

¶ 7     After the defendant and his cohorts sped off in the automobile, witness Hassan Perry saw the victim lying on the ground and left to tell the victim's mother that the victim had either been shot or fainted. Witness Randy Donald ran to the victim and noted he was conscious. Donald picked up the victim, took him into the community center, and laid him on a table. The victim's mother came into the community center, and it was discovered that the victim had been shot. The victim was subsequently taken to the hospital and died as a result of a gunshot wound to the chest.

¶ 8 The defendant testified that he did not commit the shooting and denied being present in the red car with Hinton, Smith, Carter, Ammonnette, and West at the time of the shooting. The defendant claimed that he did not want to be involved in Hinton's "beef" with Sanders and had been let out of the car prior to the shooting. The defendant alleged that he was being framed because the others were mad at him for leaving. The defendant also testified, however, that he "[took] the charge" for his associates because he thought it would make him famous in the rap industry if he beat a murder charge.

¶ 9 The trial court found the defendant guilty of first degree murder, specifically finding that the defendant personally discharged a firearm that proximately caused the death of another person. The trial court ordered that a presentence investigation report (PSI) be prepared, and the case was subsequently set for sentencing. Prior to sentencing, the defendant filed a posttrial motion for a new trial.

¶ 10 The PSI contained information concerning the defendant's offense and background. Attached to the PSI were the defendant's high school records, a discharge summary from Chestnut Health Systems, and a mental health and a substance abuse assessment. Also attached were victim impact statements from the victim's family. The PSI and its attachments revealed that the defendant easily lost his temper and had a history of conflicts with peers at school, often threatening to hurt others. This required the school to change students' schedules to ensure their safety. It was also reported that the defendant threatened harm to and intimidated school staff, lacked empathy for others, had a history of lying, and failed to accept responsibility for actions, preferring to blame others.

¶ 11 The defendant's criminal record indicated that he had juvenile adjudications for aggravated battery of a school employee, burglary, property damage, residential burglary, and several

4

probation violations. The defendant's juvenile record showed that he was released from juvenile detention on October 1, 2015, the defendant's eighteenth birthday.

¶ 12     In the PSI, the defendant reported that he had taken medications in the past for attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), attention deficit disorder (ADD), depression, and mood swings. The defendant had also been seen by several psychiatrists over the years. He was admitted to the Kettler Center and was referred to Wellspring Resources, Chestnut Health Systems for the Mental Health Juvenile Justice program, and "RAVEN" but was resistant to counseling services. The defendant disclosed that he had attempted to harm himself on multiple occasions and attempted suicide six times. He stated that he "gets real depressed for no reason" and has cut his wrists and burned himself in the past. The defendant added that he frequently talks to himself and hears "things sometimes." The defendant also disclosed that his mother's first husband abused the defendant as a child.

¶ 13     While the defendant denied drinking alcohol regularly, the defendant reported that he began smoking marijuana at the age of 10. When not in juvenile custody, the defendant admitted to daily use of marijuana, "heavy" pill usage, regular use of ecstasy and psilocybin mushrooms, and drinking "Lean," also known as liquid heroin. The defendant received inpatient and outpatient treatment for substance abuse, but the treatment was unsuccessful. When the defendant was released from juvenile custody, he returned to his regular drug usage.

¶ 14     At sentencing, the defendant faced a sentencing range of 45 years to life in IDOC. See 730 ILCS 5/5-4.5-20(a) (West 2016) (statutory range for first degree murder); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016) (statutory range for firearm enhancement). The State elected not to present any evidence but asked the trial court to consider the PSI. The victim's mother read a victim impact statement. The defendant did not present evidence but did make a statement in

5

allocution. In his statement, the defendant admitted to being in the car but denied being the shooter. The defendant appeared to blame another individual named "Oshon (ph.)," but the defendant had been reluctant to "tell on him" and "bring him into the situation."

¶ 15    After the defendant's statement in allocution, the State presented its sentencing argument. The State began by highlighting the fact that an 11-year-old child, who was an innocent bystander, died because of an ongoing rap dispute between high schoolers. The State contended that the defendant refused to accept responsibility for the shooting, despite the overwhelming evidence that he was the shooter. The State submitted that the defendant's belief that a murder charge could make him famous evidenced that the defendant placed little value on the seriousness of the offense and the fact that a child's life was taken. The State pointed to the PSI and argued that rehabilitation was not appropriate for the defendant, given his history and characteristics, substance abuse history, and juvenile record. The State argued that the defendant was just 3 months and 10 days past his eighteenth birthday and that it was "no surprise" the defendant committed the offense. The State added that the defendant showed no remorse and preferred to blame others, as his past evaluations had shown. The State alleged that the defendant wears this case as "a badge of honor for street credibility." The State asserted that incapacitation of the defendant was necessary to protect others from the defendant. The State noted that the defendant would have been eligible for an extended term sentence because the victim was a minor, but the defendant was already facing life because of the available sentencing range. The State argued that the defendant destroyed a family and that the trial court should consider the defendant's history of delinquency and the need to deter others in aggravation of the defendant's sentence. The State asked the trial court to sentence the defendant to an aggregate term of 70 years in IDOC, 45 years for first degree murder and an additional 25 years for the firearm enhancement.

¶ 16    For the defense, trial counsel argued that everyone in the car on the day of the shooting was responsible for the shooting. Trial counsel also argued that the facts did not show the defendant was "out there acting as a tough thug and acting as if he was indifferent and callous towards what took place." Trial counsel submitted that the defendant did not make the plan to go to Alton Acres and that the dispute at issue did not involve the defendant. Trial counsel stated that he was very familiar with the defendant and had represented him for most of the defendant's juvenile cases. Trial counsel acknowledged that the defendant had a temper and behavior problems, was a troubled child who had been abused when he was 12 years old, and was not acting like a 19-year-old[1] who respects people. Looking at the factors in mitigation, trial counsel argued that the defendant did not contemplate his conduct would cause or threaten serious physical harm to another. Trial counsel continued that the defendant had substantial grounds tending to excuse or justify his conduct. Trial counsel asserted that the defendant did not have the best life and, if sentenced to the minimum term of 45 years in IDOC, would be released when he is 64 years old, if he survives. Trial counsel further argued that the State was seeking an "in prison death penalty." Ultimately, trial counsel requested the trial court sentence the defendant to 45 years in IDOC.

¶ 17    After hearing arguments from the parties regarding an appropriate sentence, the trial court indicated that it had considered the evidence at trial, the PSI and its attachments, the financial impact of incarceration, as well as the defendant's history, character, attitude, and statement in allocution. The trial court also stated that it had considered the factors in aggravation and mitigation that applied to the defendant's case and could not be vindictive or take retribution for the victim. The trial court then sentenced the defendant to an aggregate of 55 years in IDOC—30 years for first degree murder plus an additional 25 years for personally discharging a firearm that

---

[1]At the time of sentencing, the defendant was 19 years old.

proximately caused the death of another person—followed by 3 years of mandatory supervised release. No postsentencing motion to reconsider or challenge the constitutionality of the defendant's sentence was filed. This appeal followed.

¶ 18                                             ANALYSIS

¶ 19    The defendant contends that his 55-year sentence is a *de facto* life sentence that violates the eighth amendment and the proportionate penalties clause as applied to him. The defendant asks this court to vacate his sentence and remand his case for a new sentencing hearing. The State responds that the defendant's constitutional challenge is premature because the record is not sufficiently developed for our review. The State further argues that, even if we considered the merits of the defendant's claim, his sentence is not unconstitutional under either the eighth amendment or the proportionate penalties clause.

¶ 20    The defendant's as-applied challenge is premised on a line of cases providing heightened protections to juveniles in sentencing. See *Roper v. Simmons*, 543 U.S. 551, 574-75 (2005) (eighth amendment prohibits death penalty for juveniles who commit homicide); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (eighth amendment prohibits mandatory life without parole sentences for juveniles who commit nonhomicide offenses); *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (eighth amendment prohibits mandatory life without parole sentences for juvenile offenders convicted of homicide). *Miller* does not, however, prohibit life sentences for juvenile offenders who are the "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 577 U.S. 190, 209 (2016).

¶ 21    Our supreme court has since expanded the protections in *Miller* to juveniles receiving *de facto* life sentences:

8

"A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *People v. Reyes*, 2016 IL 119271, ¶ 9.

After *Reyes*, our supreme court determined that a prison term of 40 years or more for a juvenile offender is a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶ 40.

¶ 22    In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court again extended the protections in *Miller* to discretionary life without parole sentences for juveniles. The court stated that "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *Holman*, 2017 IL 120655, ¶ 40. Pursuant to *Holman*, a juvenile defendant may only be sentenced to life imprisonment without parole if the trial court determines that the defendant's conduct demonstrated "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 23    Here, the defendant seeks to extend the sentencing protections afforded to juvenile offenders to his case where the defendant was 18 years, 3 months old at the time of the offense. The defendant asserts that his sentence is unconstitutional under both the eighth amendment and the proportionate penalties clause as applied to him because the trial court imposed a 55-year *de facto* life sentence without any meaningful consideration of the defendant's youth and its attendant characteristics, his rehabilitative potential, or without making a finding of permanent

9

incorrigibility. The defendant argues that there is little distinction between juvenile offenders and those who are barely over the age of 18.

¶ 24    An as-applied challenge to a defendant's sentence requires a showing that his sentence is unconstitutional as it applies to the specific facts and circumstances of the defendant's case. *People v. Harris*, 2018 IL 121932, ¶ 38. For purposes of appellate review, it is paramount that the record is sufficiently developed because all as-applied challenges are dependent on the specific facts and circumstances of the individual raising the challenge. *Harris*, 2018 IL 121932, ¶ 39.

¶ 25    In *Harris*, the defendant was convicted of first degree murder, attempted first degree murder, and aggravated battery with a firearm and was sentenced to a mandatory minimum aggregate sentence of 76 years in IDOC. *Harris*, 2018 IL 121932, ¶ 1. At the time of the offenses, the defendant was 18 years, 3 months old. *Harris*, 2018 IL 121932, ¶ 1. At the defendant's sentencing hearing, the defendant presented mitigating evidence, which included that the defendant had no prior criminal history, obtained his general education diploma (GED) and several educational achievement certificates while in pretrial custody, and had a stable and supportive family. *Harris*, 2018 IL 121932, ¶ 16. In sentencing the defendant, the trial court indicated that it had considered the statutory sentencing factors and stated, " 'This is a serious case. I am sorry that the sentencing parameters are such that my options are somewhat limited. Although, I do feel you should be treated seriously.' " *Harris*, 2018 IL 121932, ¶ 16.

¶ 26    On appeal, the defendant in *Harris* challenged his sentence under the eighth amendment and the proportionate penalties clause. *Harris*, 2018 IL 121932, ¶ 17. The appellate court rejected the defendant's facial challenge pursuant to the eighth amendment but vacated his sentence under the proportionate penalties clause and remanded the case for resentencing. *Harris*, 2018 IL 121932, ¶ 18. Our supreme court, however, found that the defendant's as-applied challenge under

10

the proportionate penalties clause was premature because the trial court record had not been sufficiently developed. *Harris*, 2018 IL 121932, ¶ 46. The supreme court specifically noted that the record did not contain evidence or findings of fact from the trial court about how the evolving science on juvenile maturity and brain development, which helped form the basis for the *Miller* decision, applied to the defendant's specific facts and circumstances. *Harris*, 2018 IL 121932, ¶ 46. Consequently, our supreme court found that the defendant's as-applied challenge was premature. *Harris*, 2018 IL 121932, ¶ 46.

¶ 27     In a recent decision, this court, following our supreme court's guidance in *Harris*, declined to consider an 18-year-old defendant's as-applied proportionate penalties clause challenge to his discretionary 51-year sentence because the record had not been sufficiently developed in the trial court. *People v. Harris*, 2020 IL App (5th) 160454, ¶ 72. In that case, the defendant was convicted of first degree murder and found to have personally discharged a firearm that resulted in the victim's death. *Harris*, 2020 IL App (5th) 160454, ¶ 72. Prior to the defendant's sentencing, a PSI was submitted which contained information concerning the defendant's offense, criminal history, education and employment history, marital and family information, substance abuse experience, and physical and mental health history. *Harris*, 2020 IL App (5th) 160454, ¶ 32. At the sentencing hearing, the defendant presented additional evidence in mitigation regarding his background, lack of criminal history, and education. *Harris*, 2020 IL App (5th) 160454, ¶ 33. The defendant did not, however, make any constitutional challenge to his sentence or offer any evidence as to how the emerging science regarding juvenile maturity and brain development applied to him. *Harris*, 2020 IL App (5th) 160454, ¶ 72. Accordingly, we declined to review the defendant's as-applied constitutional challenge. *Harris*, 2020 IL App (5th) 160454, ¶ 72.

11

¶ 28    Here, the defendant did not raise any as-applied constitutional challenge or offer any evidence at sentencing. The only information regarding the defendant's background was contained in the PSI and its attachments. The defendant also did not file a postsentencing motion raising any constitutional challenge to his sentence. Thus, the record does not contain evidence or findings from the trial court as to how the evolving science on juvenile maturity and brain development applied to the defendant's specific facts and circumstances.[2] Because the record before this court is not sufficiently developed, we may not consider the defendant's as-applied challenge because it is premature. Consistent with our supreme court's decision in *Harris*, however, " 'we do not intend for our disposition to preclude defendant from advancing his claim through other available proceedings.' " *Harris*, 2020 IL App (5th) 160454, ¶ 72 (quoting *People v. Figueroa*, 2020 IL App (2d) 160650, ¶ 89); see also *Harris*, 2018 IL 121932, ¶ 48.

¶ 29    As an alternative remedy, the defendant asks this court to find that his sentence is excessive and reduce his sentence pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967). The power to reduce a sentence should be exercised cautiously and sparingly, and we will not alter a defendant's sentence unless the trial court abused its discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion where the sentence is considerably at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212.

---

[2]The impact of the dissent in this case would be to require trial courts to consider the *Miller* factors in all cases involving young adult defendants even without any evidence or argument from the defendant that *Miller* applies. That is not, however, the current state of the law. As an adult, *Miller* does not apply directly to the defendant's circumstances. See *Harris*, 2018 IL 121932, ¶ 45. In fact, the current state of the law does not require a *Miller*-compliant hearing for adults. To do as the dissent suggests, would be to require a new sentencing hearing in almost every case involving a young adult defendant.

¶ 30    Accordingly, the trial court has broad discretion in imposing a sentence. *Alexander*, 239 Ill. 2d at 212. We give great deference to the trial court's sentencing decisions because the trial court, having observed the defendant and the proceedings, is in a superior position to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Alexander*, 239 Ill. 2d at 212-13. A reviewing court must not substitute its judgment for the trial court's merely because the reviewing court would have weighed these factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 31    Here, the testimony adduced at trial showed that the defendant fired a gun from a moving vehicle toward a community center where people were standing outside. One of the bullets fired by the defendant struck and killed the 11-year-old victim. The shooting in this case stemmed from a feud between the defendant's cohorts and other young men who were present at or near the community center. The victim was an innocent bystander. Moreover, the PSI indicates that the defendant had a significant juvenile record with adjudications for aggravated battery of a school employee, burglary, property damage, and residential burglary. Three months after he was released from juvenile detention, the defendant committed the instant offense. The defendant also has a lengthy history of serious substance abuse, behavioral problems, and mental health issues for which he did not cooperate with counseling and treatment.

¶ 32    Prior to sentencing the defendant, the trial court indicated that it had considered the evidence at trial, the PSI and its attachments, the financial impact of incarceration, as well as the defendant's history, character, attitude, and statement in allocution. The trial court also specifically stated that it had considered the statutory factors in aggravation and mitigation that applied to the defendant's case. Finally, the trial court remarked that it could not be vindictive or take retribution for the victim.

13

¶ 33    We also note that, even with the firearm enhancement, the defendant's 55-year sentence was within the statutory range of first degree murder, the primary offense. See 730 ILCS 5/5-4.5-20(a) (West 2016) (statutory range for first degree murder of 20 to 60 years). With the firearm enhancement, the defendant could have been sentenced up to life. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016) (statutory range for firearm enhancement provides for an additional 25 years to life). When the defendant's sentence is within the statutory limits, there is a rebuttable presumption that the sentence is appropriate. *People v. Gooch*, 2014 IL App (5th) 120161, ¶ 8. Under the circumstances of this case and given the trial court's broad discretion in sentencing, we find that the trial court did not abuse its discretion in sentencing the defendant to 55 years in IDOC. We decline the defendant's request to reduce his sentence under Rule 615(b)(4). Our determination here, that the defendant's sentence is not excessive, should not be construed as any indication as to whether the defendant's sentence violates the proportionate penalties clause or the eighth amendment or what the defendant's sentence should be if he receives a new sentencing hearing. Those are questions left for another day.

¶ 34    For the foregoing reasons, we affirm the defendant's sentence.

¶ 35    Affirmed.

¶ 36    JUSTICE WHARTON, dissenting:

¶ 37    I believe that the record in this case is adequate to allow us to consider the defendant's claim. Assessing that record, I find that it contains substantial evidence that the defendant was functionally younger than his 18 years when he committed the offense. In spite of this, the court did not determine whether consideration of the *Miller* factors was necessary before imposing a 55-year sentence. While I recognize that defense counsel did not ask the court to make these findings, I believe that it is appropriate for this court to overlook counsel's forfeiture of the defendant's

14

claim in order to obtain a just result in the defendant's case and to develop a sound body of precedent in this developing area of law. See *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. For these reasons, I respectfully dissent.

¶ 38   The majority correctly points out that this court may only consider a young adult defendant's claim that *Miller* and its progeny apply to his circumstances if the record is adequately developed. See *Harris*, 2018 IL 121932, ¶ 45. As the Illinois Supreme Court pointed out in *Harris*, the Post-Conviction Hearing Act (725 ILCS 5/1-122 *et seq.* (West 2016)) provides an avenue of relief in cases where the record is inadequate for a reviewing court to assess a defendant's as-applied youth-based challenge to his sentence. *Harris*, 2018 IL 121932, ¶ 48. We are, of course, obliged to follow the supreme court's holding in *Harris*. See *People v. Leavitt*, 2014 IL App (1st) 121323, ¶ 48. However, I do not believe *Harris* requires us to delay justice by refusing to consider cases where the record *is* adequate to enable us to address a defendant's claim on direct appeal.

¶ 39   In *Harris*, the defendant was convicted of a murder committed when he was 18 years and 3 months of age. *Harris*, 2018 IL 121932, ¶ 1. At sentencing, the evidence in mitigation presented by his counsel included evidence that the defendant had a supportive family and no prior criminal history, and evidence that he had worked to obtain his GED and various educational achievement certificates while he was in custody awaiting trial. *Id.* ¶ 16. On appeal, the supreme court rejected the defendant's contention that the record was sufficient to allow for direct appellate review of his claim that the evolving science on brain development in juveniles and young adults made *Miller* applicable to him. *Id.* ¶ 46. The supreme court found the record to be inadequate because it contained "only basic information about [the] defendant" and no evidence about how the evolving science of brain development underlying the *Miller* decision applied to the defendant's

15

circumstances. *Id.* The supreme court also observed that the trial court did not make any factual findings on these questions. *Id.*

¶ 40 The *Harris* court provided little guidance as to what evidence must appear in a record to make it adequate for direct review. However, I find that the state of the record in this case stands in stark contrast to that in *Harris*. Although defense counsel in this case did not ask the trial court to make findings concerning the applicability of *Miller* to the defendant, the record contains ample evidence from which the court could have made that determination at the sentencing hearing— evidence the court could rely upon on remand. The PSI indicates that the defendant has a lengthy history of treatment for multiple serious mental health conditions. Mental illness often lowers a defendant's functional age, thereby imbuing him with characteristics akin to those of a juvenile. See, *e.g.*, *People v. Savage*, 2020 IL App (1st) 173135, ¶ 67; *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 64; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14. The PSI also includes evidence that the defendant struggled with drug addictions, another factor that lends support to a defendant's claim that his brain is more like that of a juvenile than an adult. See *People v. Ross*, 2020 IL App (1st) 171202, ¶ 26. It is also worth emphasizing that the defendant in this case did not act alone; he acted as part of a group with five other people. Heightened susceptibility to peer pressure is one of the characteristics of youth emphasized by the *Miller* Court in finding that juvenile defendants are less culpable and more likely to be rehabilitated than adults. See *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 569).

¶ 41 Where, as here, the record contains sufficient applicable evidence to allow us to evaluate a young adult defendant's youth-based sentencing challenge, holding that the challenge is premature unnecessarily delays the defendant's access to justice and imposes procedural hurdles he may or may not be able to overcome. Here, there was evidence that the young defendant had diminished

mental capacity. Yet he must act on his own to initiate proceedings under the Post-Conviction Hearing Act. In order to advance to the second stage of postconviction proceedings, a *pro se* defendant must state the gist of a constitutional claim. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Although this is a very low threshold (*id.*), it may be difficult for a *pro se* defendant with diminished capacity to meet.

¶ 42    A *pro se* defendant must also file the petition in a timely manner unless he can allege facts demonstrating that his failure to do so was not due to his own culpable negligence. 725 ILCS 5/122-1(c) (West 2016). Although timeliness is an issue that may not be addressed until the second stage of the proceedings (*People v. Boclair*, 202 Ill. 2d 89, 102 (2002)), when counsel is available to help the defendant make the necessary allegations, this is of no help unless the untimeliness is, in fact, not due to the defendant's culpable negligence. Being unfamiliar with the time limits in the Post-Conviction Hearing Act—as many *pro se* defendants are—does not establish a lack of culpable negligence. *People v. Johnson*, 2015 IL App (2d) 131029, ¶ 27 (citing *People v. Hampton*, 349 Ill. App. 3d 824, 829 (2004)). Reliance on the erroneous advice of a "jailhouse lawyer" who has no specialized knowledge of postconviction procedures likewise does not establish a lack of culpable negligence. See *People v. Lander*, 215 Ill. 2d 577, 587-88 (2005).

¶ 43    Moreover, even if a defendant can get past these two hurdles, he is only entitled to the reasonable assistance of counsel, not the constitutionally mandated effective assistance of counsel applicable to trial court proceedings, including posttrial proceedings and sentencing hearings. See *People v. Owens*, 139 Ill. 2d 351, 364 (1990). This standard is "significantly lower than the one mandated at trial." *People v. Custer*, 2019 IL 123339, ¶ 30. A young defendant with mental health concerns, like the defendant in this case, has a diminished capacity to assist his attorney. He therefore needs the highest standard of legal representation, particularly when challenging his

17

sentence under the rapidly evolving law involving the sentencing of young "emerging adult" defendants. Under the Post-Conviction Hearing Act, he is instead entitled to a lesser standard of representation, and even that right only attaches after he has overcome procedural hurdles with no right to any assistance. While I recognize that this result is unavoidable in many cases, I believe that where it is possible to decide a defendant's claim without requiring him to resort to the Post-Conviction Hearing Act, we should do so. To do otherwise is inconsistent with our obligation to ensure fair and equal access to justice.

¶ 44    In the instant case, the defendant was 18 years old when he committed the offense at issue, and there was substantial evidence in the PSI to indicate that his brain development may have been more like that of a juvenile than that of a fully developed adult. As stated previously, appointed counsel did not ask the court to consider whether this was the case, and as such, the court did not consider whether it was necessary to address the *Miller* factors. The 55-year sentence imposed was 15 years longer than what our supreme court has determined amounts to a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶ 41 (holding that a sentence that exceeds 40 years constitutes a *de facto* life sentence). As applied to the defendant, I believe such a sentence violates the proportionate penalties clause unless the trial court first examines the evidence before it and either considers the *Miller* factors or determines that those factors do not apply. I believe that the most appropriate course of action would be to vacate the defendant's sentence and remand this matter to the trial court for a new sentencing hearing at which the court would be able to fully consider the mitigating evidence before it.

¶ 45    Finally, I note that the majority is concerned that the consequence of taking this approach "would be to require trial courts to consider the *Miller* factors in all cases involving young adult defendants even without any evidence or argument from the defendant that *Miller* applies." *Supra*

18

¶ 28 n.2. With all due respect, I disagree with this assessment. In this case, there was significant evidence that the defendant was more like a juvenile than a fully developed adult when he committed the offense with a group of his peers. Whether that was the case—and whether the *Miller* factors must therefore be applied—is a determination for the trial court to make. I would hold only that the record in this case was adequate to trigger that inquiry.

¶ 46    This conclusion is not altered by the fact that appointed counsel failed to ask the trial court to make the relevant inquiry. I believe that by considering the sentencing challenges of young adult defendants on direct appeal when it is feasible to do so, this court would not only provide young defendants more meaningful access to justice, we also would provide much needed guidance to courts and counsel in this important, rapidly evolving, and sometimes murky area of law. See *People v. Evans*, 2021 IL App (1st) 172809, ¶ 14 (noting that the sentencing of young adult defendants is a developing area of law); *Ross*, 2020 IL App (1st) 171202, ¶ 20 (explaining that "our supreme court has not yet outlined the parameters of an as-applied, youth-based sentencing challenge by a young adult offender"). We would also encourage courts and counsel to consider this issue at sentencing in appropriate cases, thereby necessitating fewer collateral proceedings and fewer appeals. As such, I do not believe that a holding consistent with this dissent would place an undue burden on trial courts. For these reasons, I would vacate the defendant's sentence and remand for a new sentencing hearing.

**No. 5-17-0259**

| | |
|---|---|
| **Cite as:** | *People v. Ford*, 2021 IL App (5th) 170259 |
| **Decision Under Review:** | Appeal from the Circuit Court of Madison County, No. 16-CF-85; the Hon. Neil T. Schroeder, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Eun Sun Nam, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Thomas D. Gibbons, State's Attorney, of Edwardsville (Patrick Delfino, Patrick D. Daly, and Jennifer L. Camden, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |